2013 VT 32

## Kenneth Felis v. Vickie-Lee Felis

[72 A.3d 874]

No. 12-077

Present: **Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Zimmerman, Supr. J. (Ret.), Specially Assigned**

Opinion Filed May 24, 2013

---

*Kenneth P. Felis*, Pro Se, South Burlington, Plaintiff-Appellant.

*Robert D. Rachlin* of *Downs Rachlin Martin PLLC*, Burlington, for Defendant-Appellee.

¶ 1. **Dooley, J.** Husband appeals a final divorce order issued by the Lamoille Superior Court, Family Division, arguing that the court abused its discretion in setting parent-child contact, dividing the marital estate, and awarding wife nominal maintenance and attorney's fees. We affirm the parent-child contact order, the award of nominal maintenance, and the partial award of attorney's fees out of the marital estate to wife. As to the property award, we affirm in part and reverse in part.

¶ 2. At the time of the final divorce order, husband was fifty-eight years old, and wife was fifty-seven years old. The parties had married in 1978 and separated in 2006, almost six years before the final divorce order issued in December 2011. The parties had five children during the course of the marriage, only one of whom was a minor at the time of the divorce proceedings. Their youngest son was thirteen years old when the final divorce order issued.

¶ 3. During the marriage, wife did not work outside the house but rather was a full-time homemaker who provided the primary care for the parties' children. Husband was a successful business-man and entrepreneur who amassed at least fifteen million dollars in assets over the course of the marriage. The multi-year divorce proceedings centered on determining parental rights and respon-sibilities with respect to the parties' youngest son and on valuing and distributing a marital estate valued at approximately nine million dollars and consisting of two closely-held businesses and substantial real estate holdings, including a multi-million-dollar marital residence, land holdings, and commercial properties.

¶ 4. During several days of hearings held in October 2009 and January 2010, the parties presented expert testimony and submit-ted voluminous documents. In December 2011, the family court issued a sixty-four-page, single-spaced decision that included 144

detailed findings and ten pages of legal conclusions. Following the issuance of the final order, the court denied husband's motions for a new trial and to amend the findings and judgment. In relevant part, with respect to this appeal, the family court: (1) granted wife sole parental rights and responsibilities over the parties' youngest son, with husband having parent-child contact every other week from Thursday after school until Sunday afternoon; (2) awarded wife approximately fifty-seven percent and husband approximately forty-three percent of the nine-million-dollar marital estate; and (3) awarded wife one dollar per year in maintenance.

¶ 5. Husband first argues on appeal that the family court erred in reducing his parent-child contact below that which the parties had been following since a temporary order was issued in December 2007. According to husband, there is a "disconnect" between the family court's findings and conclusions on this issue. Husband points out that in its findings the court correctly describes the temporary order as allowing him parent-child contact every other weekend through Monday morning, but then in its conclusions mistakenly refers to the temporary order as allowing him contact every other weekend until only Sunday afternoon. Husband asserts that the court's failure to explain why it deviated from the temporary order demonstrates that the court intended to leave in place the schedule set forth in that order.

¶ 6. We disagree. At trial, wife proposed a schedule that would have the parties' son return to his primary home on Sunday afternoon rather than Monday morning to facilitate the transition to the school week. Husband asked for a fifty-fifty split in parent-child contact without setting forth any proposed schedule. In its decision, the court noted that wife's proposed schedule "generally" tracked the temporary order. In fact, wife's proposed schedule did "generally" track the schedule in the temporary order, except that she wanted the parties' son to return home on Sunday afternoon rather than Monday morning to ease his transition into the school week. The court specifically stated that it was adopting the schedule wife proposed at the final hearing, not the schedule set forth in the temporary order. We presume that the court knew the difference and the basis for that difference, as expressed by wife in her testimony at the final hearing. See *Davis v. Davis*, 128 Vt. 495, 498, 266 A.2d 466, 468 (1970) ("It will also be presumed on appeal, the contrary not appearing, that all the evidence was considered by the trial court

with impartial patience and adequate reflection."). Accordingly, we find no abuse of discretion with respect to the court's parent-child contact order. See *Payrits v. Payrits*, 171 Vt. 50, 52-53, 757 A.2d 469, 472 (2000) ("The family court has broad discretion in awarding custody, and its findings will not be overturned unless clearly erroneous.").

■ ¶ 7. Next, husband raises several claims of error challenging the family court's property distribution. As husband acknowledges, he must overcome a deferential standard of review to prevail on these claims of error. See *Cabot v. Cabot*, 166 Vt. 485, 500, 697 A.2d 644, 654 (1997) ("[P]roperty division is not an exact science, and the trial court has broad discretion in considering the statutory factors and fashioning an appropriate order.").

¶ 8. Husband first contends that the court abused its discretion by crediting wife for expenditures made by him even though those expenditures had already been accounted for in determining the size of the marital estate. The bulk of the expenditures to which husband refers are two loans and a $100,000 payment to his secretary made by husband during the pendency of the divorce action. The first loan was for $145,000 to a restaurant owner who became husband's girlfriend. The owner defaulted on the loan. The other loan was for $5000 to another woman.

¶ 9. These expenditures were among those cited by wife in her January 2009 motion to freeze the marital accounts to prevent husband's wasteful dissipation of the marital estate. Following an evidentiary hearing on the motion before a different judge than the one who presided at the final divorce hearing, the court in a March 2009 temporary order determined that wife had failed to establish that husband had (1) engaged in "money laundering" through his girlfriend or secretary or any other person or business or (2) "paid unexplained, unanticipated, and excessive compensation of his assistant when compared with her historical compensation." In so ruling, the court noted the parties' agreement that the appropriate standard for determining whether husband's spending was excessive involved comparing his expenditures to the $3500 per week wife was receiving from husband under the temporary order. According to the court, it could not conclude that husband's expenditures were excessive or wasteful "if the standard of comparison is the one adopted by the parties and without further evidence of the marital standard of living."

Nonetheless, the court thereafter capped husband's use of marital funds for personal, household, and discretionary spending at $3500 per week, and further prohibited either party from incurring "a personal or business obligation in excess of $10,000.00 without first providing notice to the other party of the amount to be incurred, the purpose of the obligation, to whom it will be owed, and any security that will be provided for repayment."

¶ 10. Wife raised the issue anew in the final divorce hearing, and the judge presiding at that hearing again addressed it. The court first noted that wife's new evidence on the subject related to expenditures before the temporary order imposed a cap on expenditures by both husband and wife, and, therefore, wife was trying to relitigate claims already decided against her. As to the personal notes, the court said "now to tag [husband] . . . with those items as 'disallowed' expenditures" would arguably "be double counting." The court declined to reopen the question of "unaccounted for expenditures" during the period before the expenditure cap order "for purposes of the final tally of *marital assets actually available for allocation as of January 2010, and August 2, 2011.*"

¶ 11. Despite the above analysis, the court, in distributing the parties' various assets, listed as husband's asset $275,891,[1] which no longer exists and consists primarily of money in the cash account that was expended for the two loans and payment to his secretary as discussed above. The court explained as follows:

> By tagging [husband] with a total of $275,891 in unexplained, or disputable expenditures using marital funds . . . the court has essentially acknowledged, and taken the sting out of [wife's] "wasteful expenditure" claims. Although those claims were never proven to the court's satisfaction, nonetheless there is here some equitable recognition that a lot of cash under [husband's] nominal control had been expended in a somewhat loose fashion with no formal accounting to [wife].

---

[1] The $275,891 includes $25,891 that was paid to husband as part of a purchase of a business and is otherwise accounted for. Husband attempted to explain the disposition of the money, but the court rejected the explanations. In the absence of an explanation of its disposition, the court treated it as still available to husband and part of the marital estate. Husband has not contested that treatment on appeal.

¶ 12. In response to husband's motion to amend the court's findings and judgment, the court dismissed husband's assertion that its rejection of the wasteful dissipation claims was inconsistent with its decision to treat the spent money as an asset available to husband. The court explained that while the expenditures at issue "may not have been 'wasteful disposition,' still there was beneficial use of, or expenditure of marital assets that had to be accounted for."

¶ 13. On appeal, husband argues that the court abused its discretion by counting the disputed expenditures against him. According to husband, this treatment of those expenditures was inconsistent with the previous judge's temporary order concluding that there was no wasteful dissipation of marital assets. In short, husband asserts that the court committed reversible error by revisiting the already litigated issue of his alleged wasteful dissipation of the marital estate.

■ ¶ 14. We separate the issue into two parts: (1) whether the court may consider an asset transferred out of the marital estate as available to the party who transferred it, and if so, under what circumstances, and (2) whether the court could so consider it here. In addressing the first part of the issue, we emphasize that the applicable statute provides a broad definition of marital property subject to the jurisdiction of the superior court: "All property owned by either or both parties, however and whenever acquired, shall be subject to the jurisdiction of the court." 15 V.S.A. § 751(a). There is no question that the funds in the joint accounts from which the payment to the secretary and the loans were made were marital property within the jurisdiction of the court. The expenditures in question were made after the commencement of the divorce and acted to reduce the assets available for distribution.

■ ¶ 15. In a number of cases, this Court has held that the trial court can count as a marital asset any property — including funds — previously transferred from the marital estate for the purpose of reducing the marital property available to the other spouse. The leading decision is *Clayton v. Clayton*, 153 Vt. 138, 569 A.2d 1077 (1989),[2] in which, after the initiation of a divorce action,

---

[2] *Clayton* was preceded by *Culver v. Culver*, 133 Vt. 191, 332 A.2d 799 (1975), a case with similar facts but involving withdrawals from bank accounts transferred to

husband transferred his shares in a family corporation to his parents, without consideration and pursuant to an agreement created to ensure that none of the shares would ever be distributed to wife. The trial court included in the marital estate some of the assets husband had transferred away to the parents, in order to award a monetary sum, reflecting part of those assets, to wife.

¶ 16. This Court found that the agreement under which husband transferred the assets without consideration to his parents was of a type that had "long been contrary to public policy and unenforceable as a fraudulent transfer." *Id.* at 142, 569 A.2d at 1079. We held that it was the court's responsibility to consider "the bona fides of the transfers" and husband had the burden to present evidence that the transfers were "bona fide and not undertaken for the purpose of diminishing the value of the marital estate." *Id.* at 142-43, 569 A.2d at 1080. We upheld the trial court decision that husband "could not legally benefit from voluntarily reducing his income and assets where there appeared to be no rational business purpose and where the result would be in derogation of the rights of his wife and child." *Id.* at 144, 569 A.2d at 1081; see also *Wall v. Moore*, 167 Vt. 580, 581, 704 A.2d 775, 777 (1997) (mem.) (concluding that trial court did not err in considering as marital asset stock portfolio given to husband as part of family inheritance, even though husband sold substantial portion of stock, where husband violated divorce order freezing all assets); *Soutiere v. Soutiere*, 163 Vt. 265, 271, 657 A.2d 206, 209 (1995) (affirming trial court's determination that condominium purchased by husband from family gifts of money and titled to husband's girlfriend was marital asset, noting that case fell "squarely within a line of recent decisions giving family court judges the power to include within marital assets property which has been placed in other names to avoid distribution to a spouse"); *Nevitt v. Nevitt*, 155 Vt. 391, 400-01, 584 A.2d 1134, 1140 (1990) (concluding that trial court properly included in marital estate house transferred to husband's mother, without consideration, where court found transfer was made to deprive wife of fair portion of marital assets). In *Begins v. Begins*, 168 Vt. 298, 304-05, 721 A.2d 469, 474 (1998), we affirmed the trial court's refusal to

husband's mother after the commencement of the divorce action. See *id.* at 194, 332 A.2d at 801. There is little explanation in the opinion for the basis for the decision.

apply the *Clayton* rule to consider as a marital asset a $10,000 raise in husband's salary turned down by husband because there was no finding that husband turned down the raise for the purpose of reducing the marital assets available to wife.

¶ 17. Husband relies on a more recent application of the *Clayton* principle in *Jenike v. Jenike*, 2004 VT 83, 177 Vt. 502, 857 A.2d 798 (mem.). In *Jenike*, husband depleted an investment account by buying and selling stock in a declining market, after the divorce was filed and despite a preexisting asset freeze order. The trial court valued the account at an amount before the stock transactions depleted it on the theory, accepted in *Wall*, that the violation of the freeze order authorized that action. We reversed, holding that the stock purchases and sales were business activity allowed by the freeze order. *Id.* ¶¶ 16-17. We added, however, "the court can review the investment decisions made and determine if they were reasonable or if they were done for purposes that would not support a finding of prudent management, that is, to deliberately deplete the marital property."[3] *Id.* ¶ 17. It is this language on which wife relies.

■ ¶ 18. We recognize that the situation here is comparable to *Jenike* but different from the bulk of our *Clayton* line of cases. Wife's claim is that husband dissipated the cash assets wastefully, and not necessarily to reduce the marital assets available to her for distribution. Nevertheless, the *Clayton* line of cases, and this case, both involve what is known broadly as the "dissipation doctrine" which allows a court to return to the marital estate dissipated assets where the dissipation amounted to wrongful depletion of the estate. See L. Becker, *Conduct of a Spouse That Dissipates Property Available for Equitable Property Distribution: A Suggested Analysis*, 52 Ohio St. L.J. 95, 97-99 (1991). Although most jurisdictions recognize the doctrine in some form, there is considerable variation in what constitutes dissipation such that a court can include the dissipated asset in the marital estate. See *id.* at 111-16.

---

[3] We also noted that some of the withdrawals from the account were not for stock trading, but instead for personal purposes — for example, to pay income taxes and to pay off a mortgage on husband's property. We added that these withdrawals could be added back to marital property and justify the property award. *Jenike*, 2004 VT 83, ¶ 17. This was possible because the withdrawals for personal purposes were done in violation of the asset freeze order.

¶ 19. A review of recent decisions demonstrates the variations in the adopted standard. See, e.g., *Ethelbah v. Walker*, 225 P.3d 1082, 1090 (Alaska 2009) (holding that dissipation occurs if assets are "wasted, dissipated, or converted to non-marital form" and not "expended 'for marital purposes or normal living expenses'" (quoting *Jones v. Jones*, 942 P.2d 1133, 1139 (Alaska 1997)); *Gershman v. Gershman*, 943 A.2d 1091, 1096-97 (Conn. 2008) (holding that dissipation "at a minimum . . . requires financial misconduct involving marital assets, such as intentional waste or a selfish financial impropriety, coupled with a purpose unrelated to the marriage"); *Omayaka v. Omayaka*, 12 A.3d 96, 101 (Md. 2011) (holding that "dissipation occurs where one spouse uses marital property for his or her own benefit for a purpose unrelated to the marriage at a time where the marriage is undergoing an irreconcilable breakdown" (quotation omitted)); *Reed v. Reed*, 763 N.W.2d 686, 695 (Neb. 2009) (holding that dissipation "is defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown"); *Larsen-Ball v. Ball*, 301 S.W.3d 228, 235 (Tenn. 2010) (holding that dissipation occurs when spouse "wastes marital property" or where funds are used "for a purpose unrelated to the marriage," and concluding that courts must distinguish between "dissipation and discretionary spending").

¶ 20. *Jenike* suggested that the dissipation doctrine would apply to some expenditures but did not define a precise application standard. Nonetheless, as noted, it suggested that expenditures of the marital property would fit into one of two categories: (1) "reasonable" ones; or (2) ones "done for purposes that would not support a finding of prudent management," which we equated with "deliberately deplet[ing] the marital property." *Jenike*, 2004 VT 83, ¶ 17. Of the standards from other courts, we conclude that the definition of dissipation in the Connecticut case *Gershman v. Gershman* best describes that dichotomy. Thus, the answer to our first question is that the trial court could return the disputed assets to the marital estate for purposes of equitable distribution if it found the expenditures involved financial misconduct, such as intentional waste or selfish financial impropriety, coupled with a purpose unrelated to the marriage.

¶ 21. This brings us to the second question: whether the court could consider the expenditures in this case to be dissipa-

tion. As an initial matter, findings are required to support such a determination. Here, there are no findings of financial misconduct or intentional waste.[4] Indeed, the court observed that it could not find that the expenditures were wasteful. The biggest expenditure was for a now-uncollectible loan to husband's girlfriend to start a restaurant. We recognize that the relationship of the recipient of the loan to husband raises suspicion. We also note the conclusion of the court in *Gershman* that "[p]oor investment decisions, without more, generally do not give rise to a finding of dissipation." 943 A.2d at 1095. In this context, it was necessary for the court to make findings on whether the loan was fiscally prudent when made and the reason why the restaurant failed. There are no such findings.[5]

¶ 22. There are similar difficulties in accepting the inclusion of the amount of the $100,000 payment to husband's secretary in the marital estate. Husband justified this payment based primarily on the secretary's work in responding to discovery requests.[6] The court found that during some periods of time "it did appear that [the secretary] . . . was working almost full-time on responding to

---

[4] The trial court did not rely on a theory that husband violated an order freezing the assets and, thus, prohibiting expenditures from the bank and brokerage accounts. See *Jenike*, 2004 VT 83, ¶¶ 13-15; *Wall*, 167 Vt. at 581, 704 A.2d at 777 (court could consider asset as part of marital estate, although expended and no longer available, where spouse sold the asset in violation of an order freezing the assets of the parties). While there was an order in this case, both parties were drawing on the bank and brokerage accounts for living and discretionary expenses. In the pretrial proceeding that resulted in a limit on how much each spouse could draw from the accounts, the court ruled that husband's expenditures were not out of line of those of wife. Thus, there never was a ruling that husband violated the asset freeze order, and any such ruling would have had to acknowledge that wife also violated the order.

[5] There are also no findings with respect to the small, $5000, loan, and we reverse the decision to add this amount to the marital assets for the same reason.

[6] In the temporary order, in response to wife's motion to deny husband credit for the expenditure on the secretary, the court responded that the secretary performs "an array of personal and professional tasks for [husband]" and her compensation reflects her long employment working for husband, her management of one of husband's properties and her availability "on an approximately 24/7 basis." This is the only finding explaining what the secretary did for her compensation. It is unclear how much of her work for the compensation in issue was for the above responsibilities and not for activities directly connected to the litigation. For purposes of our analysis in the text, we assume the compensation was only for work connected to the litigation. We stress this is an assumption, and there are no findings on the point.

discovery, and producing records and documents, and preparing financial analyses, that were entirely related only to this litigation."

¶ 23. The court included the payment amount back into the marital assets. Its decision to do so is cryptic and comes right after the court awarded wife an additional $300,000 in attorney's fees: "However, the court will also allocate an additional $100,000 against [husband], . . . as the value of litigation support efforts paid for primarily out of marital funds, for his assistant." Although it is not entirely clear, we understand that the court's rationale was that husband's litigation costs, including the payment to the secretary, were unreasonable. There is, however, no finding to that effect because husband was not seeking an award of attorney's fees or litigation support costs from wife or from marital assets.[7]

¶ 24. We also note that expenses a litigant necessarily incurs in responding to discovery or other information requests are not the same as expenses for legal representation or expert witnesses. The litigant is required to respond to the information requests with accurate and complete information. At least to some extent, the secretary's work benefited wife by disclosing husband's financial situation. Moreover, the attorney's fee and litigation expense awards to wife were much larger and came from marital assets before they were allocated between the parties. The court's act of adding the amount paid to the secretary and awarding the amount solely to husband meant that only he bore the burden of these expenses.[8] We conclude that the *Gershman* standard should also apply to the payments to the secretary. The amount of the payment raises questions, but there are no answers. Since we do not know what work was done for the money, the hours of work, the normal compensation rate, etc., we have no way to judge whether the payments can be added to the marital estate under the *Gershman* standard. Again, there are no findings to justify the

---

[7] The court's discussion assumes that none of the attorney's fees or costs of expert witnesses have been paid by a litigant before the court's judgment. If they were paid, the money necessarily came from marital assets and wholly upsets the court's fairness equation.

[8] Husband's argument that there was double counting appears to be based first on the adding the sum to marital property and then awarding it to husband as if it has value. We would not call that double counting. The adding of the nonexistent asset to marital property is, alone, harmless. It is the award that produces the effect to which husband objects.

court's action in placing in the marital property a sum equal to the payment to the secretary.

¶ 25. We conclude that the dissipation doctrine is broad enough to encompass the kinds of expenditures made here, but the findings do not support the application of that doctrine in this case. Thus, the trial court erred when it concluded that it would add $250,000 to the marital estate to reflect the value of improper expenditures and award the nonexistent asset to husband as part of the equitable division of the property.[9] Because the court erred in determining the elements of the marital estate, and its value, and, as a result the property award, we must reverse and remand the property award. Because the other issues raised by husband may arise again on remand, we address them here.

¶ 26. Husband also argues that the superior court abused its discretion by deviating from an equal split of the marital assets and by giving wife a nominal maintenance award based on his early retirement. In husband's view, given the size of the marital estate, the fact that he has chosen to retire early should have had little, if any, bearing on the distribution of property or an award of maintenance. According to husband, the court demonstrated its bias against him by obsessing over his financial success and ability to retire early, as evidenced by findings in which the court: (1) suggested that his early retirement might be "entirely selfish" and "socially repugnant"; and (2) noted that he planned to stay retired "and remain a member of the landed gentry." Husband also argues that bias on the part of the court is demonstrated by the court's decision (1) to skew the property distribution in wife's favor based on his early retirement and her need for marital property in lieu of maintenance, but then to award wife maintenance on top of the property award; and (2) to make him solely responsible for the marital debt obligations.

¶ 27. Notwithstanding the two unfortunate, but isolated, remarks in the court's lengthy decision noted by husband, there is

---

[9] We note that, for good reason, husband has not relied upon the doctrines of collateral estoppel or law of the case in arguing that the court erred by revisiting the "wasteful dissipation" question and counting certain past expenditures in distributing the marital assets. See *State v. Passino*, 154 Vt. 377, 383 n.2, 577 A.2d 281, 285 n.2 (1990) ("The doctrines of res judicata and collateral estoppel do not prevent reconsideration of a pretrial ruling."); *Trepanier v. Getting Organized, Inc.*, 155 Vt. 259, 265, 583 A.2d 583, 587 (1990) (citing elements of collateral estoppel, including that "the issue was resolved by a final judgment on the merits").

no evidence of bias toward husband by the court in this case. Both remarks were made in the context of the court finding that wife had failed to present evidence sufficient to impute income to husband. Indeed, the court found in favor of husband on several disputed issues addressed by the parties' experts, particularly regarding the value of certain marital assets. For the most part, husband's claim of pervasive bias is based on his dissatisfaction with the court's conclusions with respect to property distribution and maintenance. "However, adverse rulings alone do not show bias," *Dartmouth Coll. v. Kozaczek*, 2010 VT 113, ¶ 15, 189 Vt. 593, 19 A.3d 1236 (mem.), and nothing else in the record indicates bias on the part of the court in this case. See *In re Wildlife Wonderland, Inc.*, 133 Vt. 507, 513, 346 A.2d 645, 649 (1975) (noting presumption that "all evidence bearing upon issues considered by the trier was heard with impartial patience and adequate reflection," and stating that "[a] decision contrary to the desires of a party does not denote bias").

¶ 28. The trial court did not give wife a larger share of the marital property to punish husband for his early retirement, as he claims. Rather, the trial court based wife's larger share on statutory factors such as: (1) the great disparity in the parties' opportunity to acquire future assets and income, considering wife's homemaker role throughout the course of the long term marriage; and (2) the fact that wife was receiving marital property in lieu of a maintenance award. See 15 V.S.A. § 751(b). An award of approximately fifty-seven percent of the marital estate to wife was well within the court's discretion, given the import of those factors in this case. See *Goodrich v. Goodrich*, 158 Vt. 587, 593, 613 A.2d 203, 206 (1992) (noting that equitable distribution of marital assets must be equitable but not necessarily equal); cf. *Cabot*, 166 Vt. at 500-01, 697 A.2d at 654 (noting that court has discretion to make property award in lieu of maintenance and upholding court's decision to provide financial independence to parties by awarding wife property from "substantial" marital estate in lieu of maintenance).

¶ 29. Husband also argues that the court demonstrated bias by assigning to him all of the liability associated with an aging commercial property used as a manufacturing facility for one of his businesses. The court found the debt on that property to be approximately $600,000. The family court rejected the opinion of

wife's expert that the property was worth $1.9 million, concluding that the property must be valued at $0 because there was no persuasive means of calculating a credible fair market value. In assigning the debt solely to husband, the court noted the possibility of the property eventually turning a profit and also wife's outstanding attorney's fee obligation beyond that awarded by the court. Husband speculates that he will most certainly wind up incurring the full debt of the property in question, while wife surely will not have to pay attorney's fees beyond that ordered by the court, given the court's assessment that the fees were excessive. Notwithstanding husband's speculations as to what the parties will actually wind up paying with respect to their respective debts, we find no abuse of discretion. Husband has failed to demonstrate that there is no credible basis underlying the court's reasoning. There is no indication that it was motivated by bias against husband.

¶ 30. Finally, with respect to the property award, husband argues that the court abused its discretion by failing to attribute fault for the break-up of the marriage to wife based on her "serial infidelity." The point of this argument is that husband claims that the last factor in the statutory list of permissive factors — "the respective merits of the parties" — should have been weighed against wife and affected the distribution of the property. See 15 V.S.A. § 751(b)(12). We emphasize that the superior court has broad discretion in fashioning a property award and in weighing the statutory factors. *Molleur v. Molleur*, 2012 VT 16, ¶ 15, 191 Vt. 202, 44 A.3d 763.

¶ 31. The court found that wife had three episodes of secretive marital infidelity during the marriage. The court further found that husband's suspicions of her marital infidelity in 2005, which she denied, appeared to have been the precipitating factor in hastening the parties' divorce. But the court also found that at times throughout the marriage husband had been "distant, aloof, over-bearing, controlling, dictatorial, and sometimes verbally angry, cursing and aggressive." The court concluded that "fault" was not a "decisive, or even significant factor in this case," noting the conduct on each side. We decline to disturb the assessment of the factfinder on this issue, in light of the standard of review.

¶ 32. Husband next argues that the court erred in awarding wife nominal maintenance in the amount of one dollar per year.

He asserts that there is no basis to support the court's nominal maintenance award because wife's property award is more than sufficient to meet her reasonable needs over her lifetime. He further contends that the court compounded its error by calculating reasonable needs based on wife not having to invade the principal of her property award. We find these arguments unavailing.

¶ 33. We have held that "a court may award maintenance in a nominal amount, to preserve the court's ability to modify the award later in the event of a real, substantial, and unanticipated change in circumstances." *Arbuckle v. Ciccotelli*, 2004 VT 68, ¶ 8, 177 Vt. 104, 857 A.2d 324 (quotation omitted). In *Henry v. Henry*, 162 Vt. 613, 643 A.2d 845 (1994) (mem.), we affirmed an award of nominal maintenance where the recipient-spouse had had emotional problems in the past and the court was concerned that if they reoccurred, the recipient would be unable to support himself. We noted that any increase in the maintenance would have to be based on a "real, substantial, and unanticipated change of circumstances," 15 V.S.A. § 758, and the obligor-spouse could resist the modification then "rather than at this time." *Henry*, 162 Vt. at 613, 643 A.2d at 846.

¶ 34. In this case, wife sought an award of substantial maintenance. Husband's position was that he had retired and would not in the future earn any income from employment. In light of the size of wife's property award, the court concluded that wife could not demonstrate sufficiently compelling circumstances to require the court to consider imputing income to husband and forcing him to liquidate much of his property award to provide her maintenance. Nonetheless, the court, albeit with expressed trepidation given the parties' litigious history, imposed the nominal maintenance award in the event unanticipated circumstances justified a later maintenance award — specifically that husband would come out of retirement and again begin earning substantial income. We believe that the court's rationale fits within our holding in *Henry* and that the award of nominal maintenance was within the court's discretion. As we said in *Henry*, should wife seek greater maintenance in the future, she faces a significant hurdle under the changed circumstances standard. Husband can

oppose a substantial maintenance award at that time, if it ever arises.[10]

¶ 35. The last issue involves the award of litigation expenses to wife. Husband argues that the family court abused its discretion in awarding wife a significant portion of her litigation expenses. In faulting the court, husband cites both the inordinate amount of wife's litigation costs as well as the trial court's failure to acknowledge the entire amount of wife's litigation costs that he paid during the pendency of the divorce.

¶ 36. Several pages of the court's lengthy decision are dedicated to considering wife's request for attorney's fees and other litigation expenses. The court essentially agreed with husband's assessment that wife's litigation costs, which included $815,000 in attorney's fees and another $300,000 in expert fees and expenses, were excessive. The court opined that, even for a spouse such as wife with limited access to the other spouse's financial records in a vigorously contested and factually complex divorce contest, litigation costs would normally be around $300,000. The court stated that litigation costs up to that amount could be considered reasonable and necessarily incurred and that it would also allocate against husband an additional $100,000 in litigation costs based payments he made to his assistant out of marital funds for litigation support, a subject we addressed above. In its final decree, the court ordered husband to pay wife $300,000 "off the top" out of an account in the marital estate before it was distributed to the parties.

¶ 37. In his motion to amend the findings and judgment, husband pointed out that the court had recognized only $100,000 out of the $210,000 in litigation expenses that he had been required to pay wife under previous orders of the court. In its order denying the motion to amend, the court acknowledged its failure to recognize the full amount of wife's litigation costs previously paid by husband, but stated that its mistake did "not fundamentally change the court's view of achieving a realistic,

---

[10] Husband argues that under the property award, maintenance would never be justified in this case because wife's reasonable needs are already met. As the court explained, the property award was sufficient only if wife significantly downsized her home and that future circumstances could erode the scenario that was likely at the time of the decision. Again, we conclude that arguments about whether substantial maintenance might be appropriate in the future should await an attempt to modify the nominal award, should that ever occur.

equitable and final resolution as to the available marital assets" in light of its "overriding goal . . . to achieve a distribution which would allow the parties to live separately and independently, taken as a whole, going forward."

¶ 38. As husband acknowledges, in the end the court effectively awarded wife $510,000 "off the top" of the marital estate in attorney's fees, thereby requiring him to pay half of those fees, or roughly $255,000. Husband does not challenge the court's conclusion that $300,000 in litigation costs for wife would be reasonable. Indeed, he asks this Court to limit his payment of wife's litigation costs to $300,000. Yet, as noted, husband appears to acknowledge that his earlier payments for wife's litigation costs, as with the $300,000 awarded in the final order, were "off the top" of the marital estate. In short, husband paid out of his share of the marital estate only $255,000 of wife's litigation costs, less than the $300,000 limit he requested as reasonable.[11]

¶ 39. Wife sought from husband over one million dollars in lawyer and related fees for the merits trial and additional hundreds of thousands of dollars under temporary orders. She received only a relatively small portion of the requests because the court required her to pay fifty percent of the fees it recognized as reasonable and found a large portion of the request not to be reasonable. The court has substantial discretion in making an award of attorney's fees. *Begins*, 168 Vt. at 305, 721 A.2d at 474. We find no abuse of discretion here.

*The judgment of the superior court with respect to parent-child contact, maintenance and attorney's fees is affirmed. The judgment with respect to the division of marital property is affirmed in part, and reversed in part, and remanded for proceedings consistent with this opinion.*

---

[11] We recognize that another $100,000 was assessed against husband so that he would absorb the amounts he paid his secretary. We have reversed and remanded that charge above.