NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2015 VT 129

No. 2015-092

| | |
|---|---|
| Kenneth P. Felis | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| Downs Rachlin Martin, PLLC, and | June Term, 2015 |
| Gallagher, Flynn & Company, LLP | |

Helen M. Toor, J. (motion to dismiss); Dennis R. Pearson, J. (final judgment)

Jennifer B. Colin of Stackpole & French Law Offices, Stowe, for Plaintiff-Appellant.

Eric S. Miller and Kevin A. Lumpkin of Sheehey Furlong & Behm P.C., Burlington, for
  Defendant-Appellee Downs Rachlin Martin PLLC.

Matthew B. Byrne and David A. Boyd of Gravel & Shea PC, Burlington, for
  Defendant-Appellee/Cross-Appellant Gallagher, Flynn & Company, LLP.


PRESENT:  Dooley, Skoglund, Robinson and Eaton, JJ., and Morse, J. (Ret.),
          Specially Assigned


¶ 1.  **DOOLEY, J.**  This case arises out of a divorce proceeding between plaintiff Kenneth Felis and his former wife, Vicki Felis.  Defendant Downs Rachlin Martin, PLLC (DRM) represented Ms. Felis in the divorce proceeding, and defendant Gallagher, Flynn & Company, LLP (GFC) was retained by DRM on behalf of Ms. Felis to prepare business valuations related to the proceeding.  Plaintiff appeals the decision of the Chittenden Superior Court, Civil Division, granting defendants' motions to dismiss plaintiff's claims of fraud and

breach of fiduciary duty based on DRM's representation of Ms. Felis. GFC cross-appeals the superior court's denial of its motion to strike pursuant to 12 V.S.A. § 1041.[1] We affirm.

¶ 2. Plaintiff's complaint alleges the following, as relevant to this appeal. In January 2007, plaintiff commenced a contentious, multi-year, high-asset divorce proceeding against Ms. Felis. At the time of filing, the parties to the divorce had a minor child and a marital estate worth approximately twelve to fifteen million U.S. dollars in cash, assets, real property, and business interests. Both parties were represented by counsel throughout the duration of the proceeding. In February 2008, Ms. Felis hired DRM, a Vermont-based law firm, to represent her in the divorce; this representation continued until May 2011. DRM subsequently retained the services of GFC to appraise plaintiff's interest in several business enterprises.

¶ 3. Plaintiff alleges that early on in the litigation "[t]he red fee-building flag went up . . . in DRM's handling of the case" when DRM twice asked the court for large distributions from the marital estate to pay legal fees and expenses, both of which the court granted. According to plaintiff, DRM's litigation strategy was to "build its fees and harass and injure" plaintiff by "pursuing unreasonable legal positions, demanding extensive and unnecessary discovery, promoting and claiming outrageous asset valuations, raising claims without proper foundation . . . and billing excessive time."

¶ 4. In November 2008 and January 2009, defendants filed documents with the court on Ms. Felis' behalf, claiming plaintiff wastefully dissipated millions of dollars from the marital estate. Plaintiff's counsel devoted extensive time producing detailed financial records for Ms. Felis and preparing accounting documents to defend against the claim. Plaintiff alleges that this claim was "without proper cause and for improper and wrongful motive, namely to build fees

---

[1] Section 1041 of Title 12 is Vermont's anti-SLAPP (Strategic Lawsuit Against Public Participation) law.

and harass and injure" him. After a hearing, the court found insufficient evidence to support the claim.[2]

¶ 5. Plaintiff also alleges that GFC's expert testimony on the valuation of his business was part of defendants' fee-maximization strategy. Specifically, he claims that years of discovery and hundreds of thousands of dollars were invested in analyzing the extensive financial and business information, but that "DRM intentionally and wrongfully put up false expert testimony of GFC in an attempt to influence the court to improperly value [plaintiff's] business assets and achieve an exorbitant and outrageous property distribution for Ms. Felis that was not grounded in the law."

¶ 6. At the close of the divorce proceeding, DRM billed Ms. Felis over $800,000 in attorney's fees, and GFC billed roughly $248,000 for its services. The family court found the fees unreasonable and awarded a substantially lower sum from the marital estate. Plaintiff alleges that DRM required Ms. Felis to sign an "Acknowledgment" agreeing to pay DRM any money distributed to her in the divorce order until DRM's bill was satisfied in full. Under the agreement, if those funds were insufficient, Ms. Felis was obligated to liquidate real estate and other assets awarded by the court in order to pay the bill. Plaintiff contends that this "Acknowledgment" "demonstrates improper motive on the part of DRM to engage in protracted and vexatious litigation against [plaintiff] in order to build fees that would be paid through the marital estate."

---

[2] The divorce case eventually reached this Court, and the treatment of the wasteful dissipation claim was one of the main issues on appeal. Felis v. Felis, 2013 VT 32, 193 Vt. 555, 72 A.3d 874. The family court first ruled that Ms. Felis had failed to establish wasteful dissipation. The court then ruled, in the final divorce order, that the value of certain expenditures plaintiff had made would be considered a current asset to be distributed to him, and lowered the value of the rest of the property distributed to plaintiff. On appeal, we ruled that, under the "dissipation doctrine," the court had the power to treat wrongfully dissipated assets, including cash, as a current asset, but that the findings did not support application of the dissipation doctrine. Id. ¶ 25. As a result, plaintiff prevailed on that issue in this Court.

¶ 7.    Finally, plaintiff alleges that, during the child-support hearing, DRM submitted to the court a false financial affidavit regarding Ms. Felis' indebtedness.  He claims that "DRM knowingly submitted false material evidence" or "participated in the submission of false material evidence" to the court with the intent of improperly influencing the outcome of the trial, interfering with the court's impartial adjudication of the proceeding, procuring a strategic advantage, and causing damage and injury to plaintiff.

¶ 8.    Plaintiff filed suit in superior court.  The complaint set forth extensive and detailed factual allegations but contained only one theory of liability, fraud, which was alleged in a short statement.  DRM filed a motion to dismiss for failure to state a claim, V.R.C.P. 12(b)(6), on the ground that plaintiff failed to allege facts sufficient to support his fraud claim, and argued that the litigation privilege and collateral estoppel barred plaintiff's claims.  GFC filed a similar Rule 12(b)(6) motion, as well as a motion to strike under 12 V.S.A. § 1041 and motions to dismiss on witness immunity and collateral estoppel grounds.  In his briefing to the superior court on the motions to dismiss, plaintiff additionally asserted a breach of fiduciary duty claim, upon which the superior court ruled.[3]

¶ 9.    The superior court granted defendants' Rule 12(b)(6) motions, concluding that: (1) DRM owed no duty to plaintiff on which he could base a claim for breach of fiduciary duty; and (2) plaintiff failed to allege the necessary elements of fraud in his complaint.  With respect to the fiduciary duty claim, the court stated that a party to litigation cannot assert negligence or breach of fiduciary duty against opposing counsel.  The court also found no merit in plaintiff's argument that DRM owed a duty to the marital estate, reasoning that, because nearly all divorce proceedings result in fees being paid from the joint assets, adopting such a theory "would mean that every litigant in every divorce case might have a claim against opposing counsel for breach

_____

[3] The court noted in its decision that it chose to address the fiduciary duty claim, rather than require plaintiff to amend his complaint, since both parties had briefed the issue.

4

of duty." With respect to the fraud claim, the court found that the plaintiff failed to allege that DRM directed the false statements to plaintiff, rather than the court, that he was unaware the statements were false, or that he relied on any allegedly false statements. Because the court dismissed plaintiff's claim on these grounds, it did not address the litigation privilege and collateral estoppel issues.

¶ 10. The superior court also granted GFC's motion to dismiss on witness immunity grounds, concluding that witness immunity covers not just false testimony but also extends to conspiracies to present false testimony. Because the court found the claims against GFC barred by witness immunity, it concluded that the § 1041 motion to strike was moot.[4] This appeal followed.

¶ 11. Plaintiff raises four main issues on appeal: (1) that his complaint supports a valid fraud claim; (2) that his complaint supports a valid claim for breach of fiduciary duty; (3) that his complaint states a cause of action for prima facie tort; and (4) that his claims are not barred by either witness immunity or litigation privilege. On cross-appeal, GFC raises two main issues: (1) that its motion to strike is not moot because it is entitled to attorney's fees and (2) that its testimony is protected under 12 V.S.A. § 1041, the so-called anti-SLAPP statute.

¶ 12. We review the superior court's decision on a motion to dismiss de novo, under the same standard as the trial court, and will uphold such a motion only if "it is beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." Birchwood Land Co. v. Krizan, 2015 VT 37, ¶ 6, ___ Vt. ___, 115 A.3d 1009 (quotation omitted). "We assume as true all facts as pleaded in the complaint, accept as true all reasonable inferences derived therefrom, and assume as false all contravening assertions in the defendant's pleading[]." Id.

---

[4] In a footnote, the superior court noted that GFC might wish to proceed with the motion to strike in order to obtain attorney's fees, if successful. The court concluded, however, that the motion would require an evidentiary hearing, additional expert and legal fees for both sides, and relitigation of the complicated business valuation issues, which the court concluded would not be a "useful exercise." The court said of its ruling, "Enough already."

5

We are limited to determining "whether the bare allegations of the complaint are sufficient to state a claim." Id. (quotation omitted).

¶ 13. We start with plaintiff's fraud claim. To maintain a cause of action for fraud, plaintiff must demonstrate five elements: "(1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party act[ed] in reliance on that fact; and (5) that thereby harmed."[5] Estate of Alden v. Dee, 2011 VT 64, ¶ 32, 190 Vt. 401, 35 A.3d 950. Failure to prove any one of the five elements defeats the fraud claim. Id. We focus on the third and fourth elements, which were central to the superior court's discussion. We conclude, as did the superior court, that plaintiff has failed to allege facts to support these two elements.

¶ 14. With respect to the third element, plaintiff's knowledge of the alleged falsity, the statements in his complaint directly contradict the presence of this element. Plaintiff alleged that "[t]he red fee-building flag went up early in DRM's handling of the case," and that "DRM demonstrated from the outset of its representation . . . that its litigation strategy and plan was to build its fees and harass and injure" him. Plaintiff further recounted his efforts defending against defendants' wasteful dissipation claim, pointing out errors in a tax form submitted by DRM on behalf of Ms. Felis, and successfully contesting GFC's business valuations. Moreover, much of plaintiff's complaint alleged DRM's demand for "extensive and unnecessary discovery," even where "significant discovery had already taken place." Drawing all reasonable inferences from these statements, plaintiff was fully aware of DRM's discovery practices early on.[6] See

---

[5] In his brief to this Court, plaintiff misstates the proper elements of a fraud claim. Even if we were to adopt plaintiff's description of the elements, his claim still would fail.

[6] Despite these allegations, plaintiff, in his briefing to the superior court, argued that he had no way of knowing about defendants' fee-building strategy until the end of the case. The court rejected this argument as contrary to the statements in the complaint. Plaintiff has abandoned this argument on appeal, making no mention of the knowledge-of-the-falsity element in his brief to this Court.

Birchwood Land Co., Inc., 2015 VT 37, ¶ 6 (stating that courts "accept as true all reasonable inferences derived" from complaint); see also Scalisi v. Fund Asset Mgmt., L.P., 380 F.3d 133, 137 (2d Cir. 2004) (stating that courts "are not required to accept as true the legal conclusions or unwarranted deductions of fact drawn by the non-moving party").

¶ 15. With respect to the fourth element, we find no allegation to support a claim that plaintiff relied on defendants' alleged misrepresentations. Plaintiff acknowledges that his complaint does not explicitly allege reliance, but he argues that reliance can be inferred "from his participation in the legal process in which he was legally bound to engage in order to get divorced." Plaintiff grounds this argument in the Vermont Rules of Professional Conduct, which require that attorneys: (1) be candid with tribunals, V.R.Pr.C. 3.3(a)(1)(3); (2) deal fairly with opposing parties and their counsel, V.R.Pr.C. 3.4; (3) refrain from charging unreasonable fees, V.R.Pr.C. 1.5; and (4) refrain from knowingly making false statements to third parties, V.R.Pr.C. 4.1. He also relies on Vermont Rule of Evidence 702, which requires that experts base their testimony on "sufficient facts or data" and "reliable principles and methods." None of this was alleged in the complaint. In essence, plaintiff asks us to assume reliance, but reliance is a required element of fraud that plaintiff has the burden to plead and prove "with particularity." V.R.C.P. 9(b). Even if plaintiff had alleged this theory of reliance in his complaint, we would have difficulty finding it consistent with plaintiff's description of defendants' actions as outrageous, harassing, exorbitant, unnecessary, unreasonable, overzealous, false and egregious, and with our description of the case in our decision in the divorce appeal as "vigorously contested." Felis, 2013 VT 32, ¶36.

¶ 16. Plaintiff advances two additional theories of reliance, neither of which we find availing. First, he argues that his reliance "arises from the fact that [defendants] intended for the Court and [plaintiff] to rely upon their invoicing and invited that reliance as part of their fraudulent scheme," which plaintiff contends "is consistent with cases . . . in which courts have

7

imposed a duty on an attorney to a non-client in situations where it was reasonably foreseeable that a third party would rely on the lawyer's representations." The first part of plaintiff's argument confuses defendants' intent and plaintiff's reliance. Defendants' intent in making the alleged misrepresentations says nothing about plaintiff's justifiable reliance, a required element of fraud. See Sugarline Assocs. v. Alpen Assocs., 155 Vt. 437, 445, 586 A.2d 1115, 1120 (1990) (stating that "with any action in fraud" plaintiff is required to show "justifiable reliance upon the misrepresentation" (quotation omitted)); Restatement (Second) of Torts § 531 (1977) (requiring justifiable reliance for recovery under fraudulent misrepresentation).

¶ 17. For the second part of his argument, plaintiff cites a string of cases, beginning with Hedges v. Durrance, 2003 VT 63, 175 Vt. 588, 834 A.2d 1 (mem.), a negligence case in which the plaintiff sued the attorney who represented her former husband in their divorce proceeding. During the proceeding, the attorney prepared a document for the sale of jointly owned property, and the plaintiff alleged that the document had been inaccurately prepared. We explained the general rule that an attorney owes no duty of care to a client's adversary in litigation, id. ¶6, but acknowledged an exception "where the plaintiff is an intended third-party beneficiary to the attorney-client relationship—in estate-planning and will-drafting cases for example," id. ¶7. Plaintiff appears to be arguing that he can use this exception to show reliance. We are uncertain how our duty analysis in a negligence case can be used to show reliance in a fraud case. In any event, this is not the kind of circumstance where plaintiff can be viewed as a third-party beneficiary of DRM's representation of Ms. Felis in a wholly adversarial proceeding. Plaintiff's third-party beneficiary argument provides no help to plaintiff in meeting his burden to show reliance.

¶ 18. Plaintiff's second additional theory of reliance is that we should join the states that allow third-party reliance to meet the reliance element of a tort claim. See, e.g., Prestige Builder & Mgt. v. Safeco Ins. Co., 896 F. Supp. 2d 198, 203-05 (E.D.N.Y. 2012) (applying New

York law); <u>Bardes v. Mass. Mut. Life Ins. Co.</u>, 932 F. Supp. 2d 636, 639-40 (M.D.N.C. 2013) (applying North Carolina law). In making this argument, plaintiff acknowledges that other states have rejected this theory and that we have not yet ruled on it. Very recently, however, we did rule on this in the context of negligent misrepresentation, holding that third-party reliance, without direct reliance by the plaintiff, was insufficient to satisfy the reliance requirement. <u>Glassford v. Dufresne & Assocs.</u>, 2015 VT 77, ¶¶ 22-23, ___ Vt. ___, ___ A.3d ___.

¶ 19. We can infer from plaintiff's argument that he is claiming any reliance by the court that harmed him as a litigant satisfies the reliance element of a fraud claim.[7] Again, plaintiff never alleged that the court relied on the evidence submitted by defendants. Rather, he repeatedly states in his complaint that the court discredited defendants' evidence and arguments. This argument essentially would emasculate the reliance element in the context of litigation, giving one side an opportunity to relitigate the substance of the adversary's case in a suit against the adversary's attorney. What plaintiff appears to be asserting here is "fraud on the court," which involves a party's attempt to improperly influence the court through such conduct as fabrication of evidence. <u>Godin v. Godin</u>, 168 Vt. 514, 519, 725 A.2d 904, 908 (1998). Although a court can vacate a judgment based on a finding of fraud on the court, a party cannot bring a private cause of action for tort under this theory. See V.R.C.P. 60(b)(3) (providing relief from judgment for "fraud . . . misrepresentation, or other misconduct of an adverse party"); <u>Interstate Fire & Cas. Co., Inc. v. 1218 Wisc., Inc.</u>, 136 F.3d 830, 836 (D.C. Cir. 1998) (stating that plaintiff cannot claim damages in tort for "fraud upon the court" because remedy lies within court's equitable power to revise judgment).

---

[7] We also note that, on this theory, only part of plaintiff's alleged damages would be compensable. For example, plaintiff alleges that DRM harassed him with unnecessary discovery requests. There is no allegation that plaintiff ever attempted to stop the discovery by seeking court action or that the court ordered discovery in reliance on DRM's misrepresentations.

9

¶ 20. The main weakness in plaintiff's argument, however, is the theory that the court relied on defendants' evidence in making rulings that injured plaintiff. Although the word "reliance," in its broadest sense, may apply to the court's actions, the court's decision is based on adversary presentations on relevant issues, a characteristic missing from the cases cited by plaintiff. For example, in Prestige Builder & Management, the plaintiff, a subcontractor on a project to build an amphitheater for a city, sued employees of the prime contractor who allegedly fraudulently certified to the city that all subcontractors had been paid, when in fact $134,927 was owed to the plaintiff, causing the city to release funds to the prime contractor without ensuring the plaintiff had been paid. 896 F. Supp. 2d at 200-01. We can find no case where a court has accepted a third-party reliance claim on the basis that the reliance was by the court and the plaintiff was a litigant who had a full opportunity to respond to the allegedly fraudulent evidence. We need not determine whether we ever would accept a third-party reliance theory in a fraud case to hold that we would not accept it on the factual situation here.

¶ 21. We turn next to plaintiff's claim that DRM breached a fiduciary duty to plaintiff. It is well established that an attorney owes no duty to an adverse party. Hedges, 2003 VT 63, ¶ 6. "This privity rule ensures that 'attorneys may in all cases zealously represent their clients without the threat of suit from third parties compromising that representation.' " Id. (quoting Bovee v. Gravel, 174 Vt. 486, 487, 811 A.2d 137, 140 (2002) (mem.)). The rationale behind this policy is particularly salient "where, as here, the third party is the client's adversary who is also represented by her own counsel in the proceedings." Id. Plaintiff seems to accept this rule on appeal and instead advances the theory that DRM's duty arises from the marital estate. Plaintiff asserts that "Vermont law is clear that when two people jointly own property, such as cash and/or property in a marital estate, they owe one another fiduciary duties that arise from the co-ownership of the common estate." He further asserts that those duties flow to their agents or representatives—here DRM.

10

¶ 22. Even if we assume that plaintiff and Ms. Felis owed to one another fiduciary duties by way of the marital estate,[8] and that those duties flowed to their attorneys, this argument fails. Beyond asserting these duties, plaintiff's argument is not entirely clear. He cites the Restatement (Second) of Torts for the proposition that "[a] person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused." Id. § 874 cmt. c (1979). It appears plaintiff is arguing that DRM assisted Ms. Felis in breaching her duty to plaintiff, by way of the marital estate. This argument has no merit.

¶ 23. Ms. Felis was required to pay the attorney's fees out of her distribution from the marital estate, and plaintiff has not alleged that she encouraged or otherwise supported DRM's alleged conduct in extending legal services that did not benefit her, or that she participated at all in this scheme. As plaintiff states in his brief to this Court, DRM engaged in "self-dealing to unjustifiably enrich [itself] from the marital estate." We previously have explained that the agency relationship is effectively destroyed "[w]hen an agent's interests in the subject matter are . . . adverse" to the principal. Mann v. Adventure Quest, Inc., 2009 VT 38, ¶ 12, 186 Vt. 14, 974 A.2d 607 (citing Restatement (Third) of Agency § 5.04 (2006)); see also Restatement (Third) of Agency § 7.03(2)(a). If, as plaintiff alleges, DRM was engaged in self-dealing, this was outside the scope of its representation of Ms. Felis and did not involve her or her fiduciary duties to plaintiff.

¶ 24. In considering other potential avenues for plaintiff's breach-of-duty argument, we draw upon our decision in Hedges, 2003 VT 63, the facts of which are set out above, supra, ¶ 17.

_____

[8] DRM argues that the case relied upon by plaintiff for this proposition, Cooper v. Cooper, 173 Vt. 1, 7, 783 A.2d 430, 436 (2001), is inapposite because Cooper recognized duties arising out of joint tenancies and tenancies in common and the marital estate here is nothing more than a legal fiction created by the court for the purpose of distributing the marital assets, some of which may not be jointly owned. As stated, we need not decide whether plaintiff and Ms. Felis owed one another fiduciary duties by way of the marital estate because, even if they did, the argument is without merit.

11

We explained in that decision that, to maintain such an action against another party's attorney, the third party must demonstrate that "the primary purpose and intent of the attorney-client relationship itself was to benefit or influence the third party." Hedges, 2003 VT 63, ¶7. (quotation omitted). The basis of the ex-wife's claim was that, because the ex-husband's attorney, in drafting the documents, was performing "a service which both parties to that proceeding wanted and needed to have performed," she was a third-party beneficiary. Id. ¶ 8. We rejected her argument, stating that we will not "separate the trees from the forest by reviewing [the attorney's] actions in drafting the deed independently of the larger adversarial context that necessitated defendant's actions in the first place—the divorce." Id.

¶ 25. We think Hedges is persuasive in this context, as the crux of plaintiff's argument appears to be that he became a third-party beneficiary of the attorney-client relationship between DRM and Ms. Felis based on DRM's handling of the marital estate and the duty of care owed to the estate. As in Hedges, the context here is a divorce proceeding, and we will not review DRM's alleged duty of care to the marital estate "independently of the larger adversarial context." Id. We therefore affirm the judgment of the superior court that plaintiff has failed to state a claim for breach of fiduciary duty.

¶ 26. We turn next to plaintiff's prima facie tort claim. Under the law of several states, a harm intentionally inflicted on another without justification is prima facie actionable. See, e.g., Vasile v. Dean Witter Reynolds Inc., 20 F. Supp. 2d 465, 497 (E.D.N.Y. 1998); see also Restatement (Second) of Torts § 870 ("One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability."). Although other state courts have adopted prima facie tort liability under § 870, this Court has yet to do so. See Fromson v. State, 2004 VT

29, ¶ 20, 176 Vt. 395, 848 A.2d 344 (observing that this Court has never decided whether to recognize prima facie tort liability). Plaintiff argues that we should adopt it here.

¶ 27. Plaintiff never argued below that defendants could be found liable on a theory of prima facie tort. He therefore waived it on appeal. See O'Rourke v. Lunde, 2014 VT 88, ¶ 21, 197 Vt. 360, 104 A.3d 92. In his reply brief, however, he urges us to remand to allow him to add a new count to his complaint alleging prima facie tort pursuant to V.R.C.P. 15(a). We held in Desrochers v. Perrault, 148 Vt. 491, 494, 535 A.2d 334, 336 (1987), that Rule 15(a) did not allow "a post-judgment amendment which brings in an entirely extrinsic theory." More recently, in Northern Security Ins. Co. v. Mitec Electronics, 2008 VT 96, ¶ 39, 184 Vt. 303, 965 A.2d 447, we held that the right of plaintiff "to amend the complaint under Rule 15 terminated when judgment was entered." These rulings are consistent with those from the federal courts under the similar federal rule. See F.R.C.P. 15(a)(3); 6 C.Wright, A. Miller & M. Kane, Federal Practice and Procedure Civil § 1489, at 814 (3d ed. 2010) ("Most courts faced with the problem [of a motion after a judgment has been entered or an appeal has been taken] have held that once a judgment is entered the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Rule 59 or Rule 60."). Plaintiff's invocation of Rule 15(a) comes too late in the process for us to give him the relief he seeks.

¶ 28. Finally, we address GFC's motion to strike pursuant to 12 V.S.A. § 1041, the anti-SLAPP statute. The superior court never ruled upon GFC's motion, concluding that, because it granted GFC's motion to dismiss plaintiff's claims on the merits, the counterclaim was moot. GFC argues that the case is not moot because it is entitled to an award of attorney's fees if it would have prevailed under § 1041. "A case is moot if the reviewing court can no longer grant effective relief." In re Moriarity, 156 Vt. 160, 163, 588 A.2d 1063, 1064 (1991) (quotation omitted). Although the court dismissed plaintiff's suit against GFC on other grounds, GFC still is entitled to relief in the form of attorney's fees if successful in dismissing plaintiff's

13

suit under the statute. 12 V.S.A. § 1041(f)(1); see Merriam v. AIG Claims Servs., Inc., 2008 VT 8, ¶ 10, 183 Vt. 568, 945 A.2d 882 (mem.) (stating that case is not moot because "the attorney's fees still present a live controversy"). We agree that GFC is entitled to a ruling on its motion and that the motion is not moot. We have the option of remanding the case to the superior court to consider the motion in the first instance or conducting our own review. We choose the latter option because the parties have briefed the applicability of the statute, we can decide the issue based on a question of law on which the standard of review is de novo, and we can avoid the accrual of even more attorney's fees for the parties.

¶ 29.   This is our first opportunity to construe Vermont's anti-SLAPP statute, although it has been in effect for almost ten years. The statute is based upon two legislative findings:

> (1) There has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and freedom to petition the government for the redress of grievances.
>
> (2) It is in the public interest to encourage continued participation in matters of public significance, and this participation should not be chilled through abuse of the judicial process.

2005, No. 134 (Adj. Sess.), § 1. In a hearing on the anti-SLAPP bill before the Senate Judiciary Committee, citizens and legal experts testified to the importance of protecting free speech in matters of "public interest and government decisionmaking," particularly in areas of land use and zoning, permitting and regulatory matters affecting communities, and public health and quality of life. Hearing on S. 103 before Senate Judiciary Committee, 2005-2006 Bien. Sess. (Vt. Mar. 2, 2006) [hereinafter "Hearing on S. 103"]. As explained, "when [citizens] participate [in such matters], they are subject to suit by parties opposed to their interests in public participation." Id. In this way, parties with financial means are able to use litigation to intimidate others into silence. Id.

14

¶ 30. Additionally, on April 11, 2006, the House Judiciary Committee delivered a floor report to the House, discussing the increase in SLAPP lawsuits over the previous twenty years. The report stated:

> These are lawsuits filed in response to or in retaliation for citizen communication with government entities or employees. People have been sued for testifying before their city councils, zoning commissions, and school boards and for reporting violations of environmental laws to regulatory agencies. SLAPP suits are intimidating, punishing and expensive for ordinary citizens to fight. . . . The objective of this bill is to help protect Vermonters' First Amendment rights and to prevent the misuse of the courts as a vehicle to punish people for expressing their opinions on issues of <u>public interest</u>.

Report to the House on S. 103 SLAPP-Suit Bill, at 1 (April 11, 2006) [hereinafter "Report"] (emphasis added).[9]

¶ 31. Roughly half the states have adopted anti-SLAPP statutes based generally on the same paradigm. See Report at 2; see also C. Barylak, <u>Reducing Uncertainty in Anti-SLAPP Protection</u>, 71 Ohio St. L.J. 845, 847 n.8 (2010) (listing twenty-seven states having anti-SLAPP statutes as of 2010); M. Sobczak, <u>Slapped in Illinois: the Scope and Applicability of the Illinois Citizen Participation Act</u>, 28 N. Ill. U.L. Rev. 559, 576 n.149 (2008) (citing anti-SLAPP

---

[9] A particular incident on which the committee heard extensive testimony represented the paradigm for the legislation. It is described in the report as follows:

> [Twelve] Barnard residents, the zoning board, and others were targets of a suit brought by a new land owner whose property development projects were impacting a public right of way. The residents signed a petition with Barnard's zoning board of adjustment appealing the landowner's permit. A retaliatory suit was served on those Barnard citizens on Christmas Eve. The right to petition is expressly recognized under Vermont law. Nevertheless, these residents decided to "cut their loses" and settle the case on terms dictated by the plaintiffs. They simple couldn't afford to pay the enormous costs of defending/litigating their constitutional rights.

Report at 1.

statutes). Vermont's statute was based primarily on the language of California's 1992 statute, but also contains language from the Massachusetts statute.[10] Report at 2; Hearing on S. 103 (statement from Legislative Counsel).

¶ 32. Under § 1041(a), a SLAPP suit is "an action arising from defendant's exercise, in connection with a public issue, of the right to freedom of speech or to petition the government for redress of grievances under the United States or Vermont Constitution." 12 V.S.A. § 1041(a). The statute accomplishes its purpose by authorizing the defendant in an alleged SLAPP suit to bring a special motion to strike within sixty days after the filing of the complaint. Id. § 1041(b). The plaintiff then has fifteen days to answer. Id. The filing of the motion normally stops all discovery until it is addressed, id. § 1041(c)(1), and a court must hold a hearing on the motion within thirty days unless the period is extended "for good cause shown." Id. § 1041(d). The motion is decided on the "pleadings and supporting and opposing affidavits," id. § 1041(e)(2), and must be granted unless the plaintiff shows "the defendant's exercise of his or her right to freedom of speech and to petition was devoid of any reasonable factual support and any arguable basis in law" and "the defendant's acts caused actual injury to the plaintiff." Id. § 1041(e)(1)(A), (B). If the court grants the motion to strike, it "shall award costs and reasonable attorney's fees to the defendant." Id. § 1041(f)(1). If the court denies the motion as "frivolous" or "intended solely to cause unnecessary delay," it must award attorney's fees and costs to plaintiff. Id.

¶ 33. In this case, GFC timely filed a motion to strike accompanied by affidavits and other voluminous supporting material. Plaintiff timely filed a response, asserting that his action was not a SLAPP suit under the statute, requesting a hearing on that question, and requesting an additional sixty days to respond to GFC's factual materials if the court ruled that the action was a

---

[10] The burden-shifting language in § 1041(e)(1) and (2) was modeled on the Massachusetts anti-SLAPP statute.

16

SLAPP suit. As noted above, the superior court never acted on the motion to strike or the response, finding it moot.

¶ 34. The issue before us turns on whether plaintiff's action is a SLAPP suit, as defined under § 1041. This requires that we determine the meaning of the language contained in § 1041(a), which we set out above, supra, ¶ 32. This language is further defined in § 1041(i), and the interplay between subsections (a) and (i) is at the heart of the question before us. Section 1041(i) specifies that "the exercise, in connection with a public issue, of the right to freedom of speech or to petition the government for redress of grievances includes":

> (1) any written or oral statement made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;
>
> (2) any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other proceeding authorized by law;
>
> (3) any written or oral statement concerning an issue of public interest made in a public forum or a place open to the public; or
>
> (4) any other statement or conduct concerning a public issue or an issue of public interest which furthers the exercise of the constitutional right of freedom of speech or the constitutional right to petition the government for redress of grievances.

§ 1041(i).

¶ 35. GFC contends that the plain language of § 1041(i)(1), which extends the protections of the statute to "any written or oral statements made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law," covers its testimony in the divorce proceeding. This argument assumes that the element "in connection with a public issue," which is stated in § 1041(a) and in § 1041(i), is not additionally required. Whether that element is required is the main statutory construction question of this case. We conclude that the statue requires all actions to be "in connection with a public issue" and hold that because GFC's testimony was not connected with a public issue, the anti-SLAPP statute is not applicable.

17

¶ 36. As noted above, the question of whether § 1041 protects GFC's testimony is a matter of statutory interpretation, which we review de novo. Stowell v. Action Moving & Storage, Inc., 2007 VT 46, ¶ 9, 182 Vt. 98, 933 A.2d 1128. Our goal in interpreting a statute is to effectuate the intent of the Legislature. Id. Where the statute is unambiguous on its face, we enforce it "according to its terms." In re Hinsdale Farm, 2004 VT 72, ¶ 5, 177 Vt. 115, 858 A.2d 249. If there is any uncertainty about legislative intent, "we look to the words of the statute itself, the legislative history and circumstances surrounding its enactment, and the legislative policy it was designed to implement." Perry v. Vt. Med. Practice Bd., 169 Vt. 399, 406, 737 A.2d 900, 905 (1999).

¶ 37. We return to the text of the statute, as relevant here. Section 1041(a) provides that the statute applies to actions "arising from the defendant's exercise, in connection with a public issue," of free speech and petitioning rights. Section 1041(i), in turn, lists four specific types of activity that fall within the language of § 1041(a)—the "exercise, in connection with a public issue," of free speech and petitioning rights. The descriptions of the activities set forth in §§ 1041(i)(3) and (4) expressly include the element "concerning an issue of public interest." The descriptions of the activities in §§ 1041(i)(1) and (2)—including the activity applicable here, testimony in a judicial proceeding—do not contain that element. GFC therefore argues that the statute does not require testimony in a judicial proceeding to concern a public issue. To put it another way, GFC's reads the statute to mean that all testimony in a judicial proceeding inherently concerns a public issue.

¶ 38. We acknowledge that GFC's reading of the statute is the most consistent with the language § 1041(i), and it also has other strong support. This reading has been adopted by the United States District Court for the District of Vermont in Ernst v. Kauffman, 50 F. Supp. 3d 553, 558-59 (D. Vt. 2014), based not only on the plain language, but also on the interpretation of nearly identical language by the California courts. The district court held that a defendant need

18

not demonstrate that a statement concerns a public issue if it falls within § 1041(i)(1) or (2).  Id.

More importantly, the California Supreme Court adopted this construction with respect to the

California statute in a decision that preceded the enactment of the Vermont statute, Briggs v.

Eden Council for Hope & Opportunity, 969 P.2d 564 (Cal. 1999), discussed in detail below.  See

infra, ¶¶42-45.  Generally, when the Legislature models a statute on that of another state, "the

presumption is that the Legislature adopted the [preceding] construction given the statute by the

courts of other jurisdictions," Lavalley v. E.B. & A.C. Whiting Co., 166 Vt. 205, 209, 692 A.2d

367, 369 (1997) (alteration and quotation omitted), absent some attendant statutory provisions or

other countervailing evidence to rebut the presumption, Giguere v. E.B. & A.C. Whiting Co.,

107 Vt. 151, 157-58, 177 A. 313, 316 (1935); see also Hartnett v. Union Mut. Fire. Ins. Co., 153

Vt. 152, 155, 569 A.2d 486, 487 (1989) (noting presumption that Legislature adopted

construction given statute by courts of other state is rebuttable).  That presumption applies here.

¶ 39.    A number of weighty considerations, however, support the opposite view—that

all activities protected by § 1041 must concern a public issue.  First, the California construction

is inconsistent with the language of subsection (a), which governs the scope of the statute

generally and requires the defendant's exercise of constitutional rights be in connection with a

public issue.  The language on which GFC relies in subsection (i) relates to the place or context

in which a statement is made, rather than content of the statement.  For this reason, the statute is

internally inconsistent and ambiguous.

¶ 40.    Where statutory provisions are in conflict, we must look beyond the plain

language of the statute.  As we previously have stated:

> When the plain meaning of statutory language appears to
> undermine the purpose of the statute, we are not confined to a
> literal interpretation, but rather look to the broad subject matter of
> the statute, its effects and consequences, and the purpose and spirit
> of the law to determine legislative intent.

19

Town of Killington v. State, 172 Vt. 182, 189, 776 A.2d 395, 401 (2001); see also Delta Psi Fraternity v. City of Burlington, 2008 VT 129, ¶ 7, 185 Vt. 129, 969 A.2d 54 (explaining that plain language of statute must not be "inconsistent with . . . other expressions of legislative intent" (citations omitted)); In re Preseault, 130 Vt. 343, 348, 292 A.2d 832, 835 (1972) ("When the provisions of a law are inconsistent, effect must be given to those which harmonize with the context and the apparent intent of the legislature."); cf. Wesco, Inc. v. Sorrell, 2004 VT 102, ¶ 14, 177 Vt. 287, 865 A.2d 350 (noting that "we favor interpretations of statutes that further fair, rational consequences" (quotation omitted)). As the "purpose and spirit of the law" is embodied in subsection (a), which specifies the public issue element, a broad reading of the categories under (i)(1) and (i)(2) would undermine that purpose and spirit.

¶ 41. Ordinarily, we would give remedial legislation, like the anti-SLAPP statute, a liberal construction. See Raynes v. Rogers, 2008 VT 52, ¶ 15, 183 Vt. 513, 955 A.2d 1135. Here, however, the statute is attempting to define the proper intersection between two constitutional rights—a defendant's right to free speech and petition and a plaintiff's right to petition and free access to the courts. See Duracraft Corp. v. Holmes Prods. Corp., 691 N.E.2d 935, 943 (Mass. 1998) ("By protecting one party's exercise of its right of petition, unless it can be shown to be sham petitioning, the statute impinges on the adverse party's exercise of its right to petition, even when it is not engaged in sham petitioning.") As the Massachusetts court noted in Duracraft, "[t]his conundrum is what has troubled judges and bedeviled the statute's application." Id. We are convinced that in this circumstance an overly broad interpretation of the statute would be inappropriate. Indeed, we join the Rhode Island Supreme Court in concluding that the anti-SLAPP statute should be construed as limited in scope and that great caution should be exercised in its interpretation. See Sisto v. Am. Condo. Ass'n, 68 A.3d 603, 615 (R.I. 2011).

¶ 42.   We return to <u>Briggs v. Eden Council for Hope & Opportunity</u>, the California Supreme Court decision that construed the language of the California statute before the Vermont Legislature modeled § 1041 on the California statute.[11]   At the time of the decision, the California appellate courts were split over whether the statute required the exercise of constitutional rights concerning a public issue. The leading decision was <u>Zhao v. Wong</u>, 55 Cal. Rptr. 2d 909 (Ct. App. 1996), which held that "[t]he statute represents a clear recognition of the need to provide maximum protection of a citizen's right to exercise free speech and petition where such rights are exercised in relation to issues of public concern." <u>Id</u>. at 915.

¶ 43.   The California Supreme Court disagreed with the <u>Zhao</u> holding and based its decision on the language of the statute, the legislative intent as expressed in a preamble to the statute, and the public policy involved.  With respect to the legislative intent, the California high court relied on an amendment to the preamble providing that the statute "shall be construed broadly." <u>Briggs</u>, 969 P.2d at 572 (quotation omitted).  The court concluded that the amendment was intended to overrule a number of holdings narrowly interpreting the statute, including that in <u>Zhao</u>.  Indeed, the court cited analysis from the California Assembly Judiciary Committee confirming "the amendment was intended specifically to overrule <u>Zhao</u>," as well as the appellate court ruling in the case before it. <u>Id</u>. at 573.  Thus, the high court concluded that the legislative intent was to protect "all direct petitioning of governmental bodies (including . . . courts and administrative agencies) and petition-related statements and writings," regardless of the subject matter. <u>Id</u>. at 574.

¶ 44.   As a matter of public policy, the California Supreme Court concluded that the bright line created by its decision was desirable as a matter of judicial efficiency and that

---

[11]   For the purposes of the issue before us, the language of the California statute, Cal. Code of Civ. Pro. §§ 425.16(b)(1) and (e)(1)-(4), essentially is identical to that of the Vermont statute, 12 V.S.A. §§ 1041(a) and (i)(1)-(4).  The actual wording has some differences, but those differences are not relevant to the question before us.

21

"straining to construe the statute as the Court of Appeals did would serve Californians poorly." Id. The court added that it had "no reason to suppose the Legislature failed to consider the need for reasonable limitations on the use of special motions to strike." Id. at 575.

¶ 45. Two justices dissented from the decision in Briggs, primarily because the effect of the majority's construction of the statute—"that every lawsuit based on any actionable word uttered in connection with any legislative, executive, judicial, or other 'official' proceeding in the State of California will henceforth, as a matter of law, be deemed a retaliatory SLAPP suit," id. at 584 (Baxter, J., dissenting)—will allow the use of the extraordinary remedy "in a great number of cases to which it was never intended to apply." Id. at 576 (Baxter, J., dissenting).

¶ 46. On the legislative history and public policy points integral to the Briggs decision, the Vermont context and experience is very different. We conclude that this difference is sufficient to overcome the presumption that the Vermont Legislature adopted the California statutory provision as interpreted by Briggs. See Giguere, 107 Vt. at 157-58, 177 A. at 316 (presumption that Legislature adopted construction is rebuttable). As we set out above, supra, ¶ 29, the Legislature made two findings that explain its intent in enacting the anti-SLAPP statute. The first finding addresses the increase in lawsuits brought to chill free speech and petitioning rights. The second states that "[i]t is in the public interest to encourage continued participation in matters of public significance, and this participation should not be chilled through abuse of the judicial process." 2005, No. 134, § 1 (emphasis added).

¶ 47. The findings reflect the broader national concerns that fueled the development of anti-SLAPP legislation. Anti-SLAPP legislation emerged in the 1990s after legal scholars brought to light the "growing legal risk for ordinary citizens who speak up on community political issues," G. Pring, SLAPPs: Strategic Lawsuits Against Public Participation, 7 Pace Envtl. L. Rev. 3, 8 (1989), including such activities as,

> [r]eporting violations of the law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature, lobbying for legislation, campaigning in initiative or referendum elections, filing agency protests or appeals, being parties in law-reform lawsuits, and engaging in peaceful boycotts or demonstrations.

Id. at 5. The concern of Pring and other commentators was the power differential inherent between citizens engaged in political participation and the entities that use their financial resources to intimidate and silence these citizen activists. Id. at 7. "These are not ordinary lawsuits," explained Pring. "They are classic 'dispute transformation' devices, a use of the court system to empower one side of a political issue, giving it the unilateral ability to transform both the forum and the issue in dispute." Id. at 12. "As these suits become an increasing (and increasingly known) risk for the ordinary citizen who decides to speak out on a public issue, SLAPPs raise substantial concern for the future of citizen involvement or public participation in government, a fundamental precept of representative democracy in America." Id. at 6.

¶ 48. We have excerpted above, supra, ¶¶ 29-30, testimony to the Senate Judiciary Committee and the Report of the House Judiciary Committee. The testimony demonstrates that the intent of the bill was to prevent retaliatory litigation against citizens exercising their right to free speech and their right to petition the government on matters of public interest. The Report of the House Judiciary Committee states that the "objective" of the bill was "to prevent the misuse of the courts as a vehicle to punish people for expressing their opinions on issues of public interest." Report at 1. We conclude from the legislative history that the Legislature intended that the protected actions be connected to matters of public interest and intended to make that connection an element of an anti-SLAPP motion.

¶ 49. Although we understand the public policy argument made by the California Supreme Court in Briggs, we note that the majority of state anti-SLAPP statutes "stipulate that, in order to successfully invoke the law, a litigant's purportedly protected communication must

23

have been about a matter of public concern." Barylak at 869. We also believe that the public policy analysis in Briggs turned out to be wishful thinking that did not predict the result of that decision. Although the establishment of a bright line rule may have simplified the issues in some litigation, it nevertheless dramatically increased the use of the anti-SLAPP remedy in suits far afield from the SLAPP suit paradigm, as feared by the dissent. See Briggs, 969 P.2d at 579 (Baxter, J., dissenting) (observing that majority holding "expands the definition of a SLAPP suit to include a potentially huge number of cases"). Indeed, California's statute has been invoked in thousands of cases on a broad range of legal issues and filing a motion under the statute has become almost a matter of course. Since its inception in 1992, California's statute has been cited in nearly 5000 appellate court decisions, almost all of them post-dating the 1997 amendment, and Briggs has been cited nearly 1000 times. We note cases from the California appellate courts involving the application of California's anti-SLAPP statute to divorce and divorce-related litigation. See, e.g., S.A. v. Maiden, 176 Cal. Rptr. 3d 567 (Ct. App. 2014).

¶ 50.    A good example of the kind of litigation that has spawned anti-SLAPP motions is Serafine v. Blunt, No. 03-12-00726-CV, 2015 WL 3941219 (Tex. Ct. App. June 26, 2015), which was decided in a state where the connection to a public issue is not an element of a SLAPP suit under the state's statute, known as the Texas Citizen Participation Act (TCPA). A thoughtful concurrence by Justice Pemberton describes the lawsuit at issue and the consequence the anti-SLAPP statute has on the suit. He refers to the TCPA as the "elephant in the room" and notes that "as written, the TCPA is, at best, a vastly overbroad 'anti-SLAPP' law." Id. at *7 (Pemberton, J., concurring). He further discusses the ramifications of the statute:

> Perhaps the most obvious take-away point is that the TCPA is less an "anti-SLAPP" law than an across-the-board game-changer in Texas civil litigation if a lawsuit like Serafine's—which arises from a boundary dispute and personality conflicts between neighboring homeowners—is elevated to the status of the "exercise of the right to petition" protected by the Act and unremarkable defensive measures like the Blunts assert are made subject to

24

> dismissal as "legal actions" "based on, relate[d] to, or . . . in response to" that "exercise."

Id. (Pemberton, J., concurring) (alterations in original). These observations mirror much of the commentary about the California anti-SLAPP statute. See generally E. Sangster, Back Slapp: Has the Development of Anti-SLAPP Law Turned the Statute into a Tool to be Used Against the Very Parties It Was Intended to Protect?, 26-SEP L.A. Law. 37 (2003).

¶ 51. The Briggs ruling is not the only source of the vast expansion of anti-SLAPP motions in California, although it is a substantial cause of that expansion. See Sobczak at 583-84; Barylak at 869 ("The presence or absence of the public concern criteria has, in certain contexts, a significant impact on the outcome of anti-SLAPP motions."). It is fair to say, however, that there is no evidence that the Vermont Legislature intended, or even foresaw, the expansive use of the anti-SLAPP remedy in circumstances far afield from the paradigm on which the statute was based. One way to reduce overuse of the remedy is to enforce the requirement of § 1041(a) that a defendant's exercise of constitutional rights be in connection with a matter of public issue, as the legislative history demonstrates the Legislature intended.

¶ 52. We conclude that the "in connection with a public issue" requirement of 12 V.S.A. § 1041(a) must be met in any motion to strike under the anti-SLAPP statute, regardless of the type of activity. We reach this result as a matter of statutory interpretation in order to implement the intent of the Legislature in adopting the anti-SLAPP remedy and keeping that remedy within the bounds of the paradigm on which it was based. Thus, in considering whether the motion to strike filed by GFC in the case before us should have been granted, we must determine whether its protected activity was in connection with a public issue.

¶ 53. GFC presented expert testimony on the value of one of plaintiff's businesses in order to support Ms. Felis' proposed property distribution in a divorce order. The testimony did not go to the appropriateness of the law with respect to valuation or distribution of marital

property, but rather applied settled law to facts.  Despite the vigor with which the divorce action was contested, it was not "a matter of public significance."  See Time, Inc. v. Firestone, 424 U.S. 448, 454 (1976) (noting that divorce proceedings are not "public controversy").  Accordingly, we hold that, because GFC's motion to strike would not have been successful if the superior court had ruled on it, the court's failure to reach the motion was harmless error.

Affirmed.

FOR THE COURT:

_____

Associate Justice