*Cegalis v. VT Digger*, 13-1-17 Wncv (Teachout, J., May 8, 2017)
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

**SUPERIOR COURT**                                           **CIVIL DIVISION**
**Washington Unit**                                          **Docket No. 13-1-17 Wncv**

**KAREN CEGALIS**
    **Plaintiff**

    **v.**

**ELIZABETH HEWITT, ANN GALLOWAY,**
**VERMONT JOURNALISM TRUST d/b/a**
**VTDIGGER**
    **Defendants**

### DECISION
### Defendants' Motion to Strike

Plaintiff Karen Cegalis has asserted defamation and related claims against Defendants Elizabeth Hewitt, Anne Galloway, and the Vermont Journalism Trust, which operates VTDigger, a news website. The claims arise out of an article authored by Defendant Elizabeth Hewitt and posted online that includes details of a child custody case involving allegations made by a father and his wife of improper sexual conduct with the child on the part of mother and her boyfriend. The article used pseudonyms for all family members involved, but Ms. Cegalis recognized that the article was based on her case, and felt that it portrayed her as having committed sexual improprieties even though such allegations have been determined in court to be unfounded.

After she filed the complaint, Defendants promptly filed a special motion to strike the complaint as a violation of 12 V.S.A. § 1041, Vermont's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute. A hearing was held on March 30, 2017. The court now concludes as follows.

*The article and Ms. Cegalis's objections to it*

The article is an in-depth examination of the murky situation that develops when allegations of sexual misconduct are made in the context of custody cases by a parent who relies on troubling statements made by a young child, and of the challenges and consequences of efforts to resolve such a situation through the court process. The article examines the dynamics of the circumstances and the actions and roles of psychiatrists, therapists, the agencies that investigate such allegations, the lawyers, and the courts.

Ms. Cegalis's principal objections to the article are that: (1) it suggests that she actually is guilty of sexual assault; (2) it suggests that the investigation as to her guilt is ongoing; (3) the writer used information sealed by the court; (4) Defendants removed reader comments favorable to her; and (5) the whole subject matter is her family's private business and should not have been the subject of any article at all.

Even the most cursory review of the most recent Vermont Supreme Court decision in the custody case, which was published before the VTDigger article, amply demonstrates why anyone in her position would have a strong reaction to anything that seemed to revive allegations of misconduct by her toward her son. *Knutsen v. Cegalis*, No. 15–133, 2016 VT 2. The decision is replete with statements emphasizing the lack of credibility or proof of any of the allegations against her, such as the following:

> The court found that mother was loving and caring toward the child, and there was no indication that she would condone anyone harming the child in any way. . . . The court found no credible factual basis to support the child's allegations of abuse, much less to support any finding that mother was a homicidal psychopath.

*Id.* ¶ 7.

> Stepmother's insistence on putting the child in the middle of her crusade spoke volumes about the sources of the child's estrangement from mother.

*Id.* ¶ 8.

> [The court] reiterated that there was no credible evidence that [son's] allegations of abuse were true.

*Id.* ¶ 11.

> None of the allegations [by father and stepmother] were grounded in fact, but they had resulted in mother's estrangement.

*Id.* ¶ 13.

> The child was entirely enmeshed, however, in father's belief that mother abused him, and the notion of the abuse was consistently reinforced by father and stepmother.

*Id.* ¶ 14.

> The court found it very clear that father and stepmother were waging war against mother and making allegations of abuse that were not true. Father, and more egregiously stepmother, had indoctrinated the child to believe that mother was out to kill him and that mother viciously abused him since he was a small child.

*Id.* ¶ 19

2

[The court] was thoroughly convinced that father and stepmother were solely responsible for the child's trauma and for his utter estrangement from mother.

*Id.* ¶ 21

As the trial court found, father and stepmother have traumatized the child and completely alienated him from his mother. . . . Their claims of abuse, which continue to expand, have been found baseless despite investigations by the Chittenden Unit for Special Investigations, the U.S. Department of Homeland Security, the Rutland Police Department, and the Department for Children and Families.

*Id.* ¶ 28

The court recognized that father and stepmother have destroyed the child's relationship with mother.

*Id.* ¶ 30.

[W]e acknowledge mother's frustration at father's and stepmother's interference in the reunification process since at least 2013 and the distressing unfairness of being denied contact with her child for more than three years based wholly upon false accusations.

*Id.* ¶ 34.

The trial court's findings in this case make it clear that mother is not by any measure unfit to parent. The court emphasizes at the outset that "at no time has it ever been established by any credible evidence that [the child] was ever sexually abused" by his mother or her prior partner. The court finds that none of the allegations of abuse "have any foundation in fact, whatsoever."

*Id.* ¶ 41 (Robinson, J., concurring).

Ironically, the only findings in this case relating to neglect or abuse implicate father, not mother. The trial court was "thoroughly convinced that father and stepmother are solely responsible for [the child's] trauma and his utter estrangement from his mother." The court finds that "father and stepmother broke all the basic rules of coparenting, and, in doing so, they obliterated this child's relationship with his mother."

*Id.* ¶ 42 (Robinson, J., concurring).

By all appearances, this wrenching situation is far from over, and the next chapter is close at hand.

*Id*. ¶ 45 (Robinson, J., concurring).

One can understand why a person in Ms. Cegalis's situation might interpret the article as rekindling allegations against her and react by feeling it is unfair when the court has found a lack of evidence of the allegations against her.

*The Anti-SLAPP Motion to Strike*

Vermont's anti-SLAPP statute is intended to provide protection against "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and freedom to petition government for the redress of grievances." 2005, No. 134 (Adj. Sess.), § 1(1).

The statute broadly protects:

(1) any written or oral statement made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law;

(2) any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law;

(3) any written or oral statement concerning an issue of public interest made in a public forum or a place open to the public; or

(4) any other statement or conduct concerning a public issue or an issue of public interest which furthers the exercise of the constitutional right of freedom of speech or the constitutional right to petition the government for redress of grievances.

12 V.S.A. § 1041(i).

The statute authorizes a defendant who was sued due to, or in anticipation of, the exercise of those rights, "in connection with a public issue," to file a special motion to strike the lawsuit at the outset of the case. 12 V.S.A. § 1041(a); see *Felis v. Downs Rachlin Martin PLLC*, 2015 VT 129, ¶ 35, 200 Vt. 465 (holding that "the statute requires all actions to be 'in connection with a public issue'").

If a motion to strike is filed and the preliminary requisites for applicability are met, the burden shifts to the plaintiff to prove that:

(A) the defendant's exercise of his or her right to freedom of speech and to petition was devoid of any reasonable factual support and any arguable basis in law; and

(B) the defendant's acts caused actual injury to the plaintiff.

4

12 V.S.A. § 1041(e)(1). If the plaintiff cannot make such a showing, the court grants the motion and the defendant is entitled to attorney fees and costs. *Id*. § 1041(f)(1). If the motion was frivolous, the plaintiff is entitled to fees and costs. *Id*.

*Whether the statute applies and provides protection for the subject matter of the article*

The first question of the analysis called for in addressing the motion to strike is whether the statute applies to protect the subject matter of the article that was published. In other words, was the article published "in connection with a public issue" (*Felis*) or "concerning an issue of public interest" (§ 1041(i)(3)).

The article in the VTDigger addresses the difficulties faced by not only family members but professionals and public institutions in the type of case it describes. It is an article about how such difficult problems get addressed in our society and the effectiveness of attempts to sort out the truth and reach a just and reasonable resolution. Ms. Cegalis's case is used as a case study to illustrate how problematic such cases can be for all involved, and to raise issues about effects that may last even after findings are made and formal cases are over. The focus is on the process by which matters of this kind are addressed by our laws and our social institutions. The message of the article is not an allegation of wrongdoing on the part of Ms. Cegalis, but an exploration of the murkiness inherent in such cases, the challenges of problem solving given the nature of the subject matter and the parties involved, and the wrenching effects on any child who is at the center of such a situation, no matter what the truth might be.

Though the article describes the specific case in which Ms. Cegalis was involved, the writer used pseudonyms, indicating that the article was not about the specific person but about this type of case. The article obviously addresses the intimate details of a specific family's custody dispute, but the references in the article to the custody case are made in the context of addressing a larger issue of societal interest: the difficulties inherent in this kind of situation and their ongoing effects. The article concerns the issue of how to achieve justice for children and families in cases such as this. It is investigatory journalism on a matter of public interest, not an accusation against her as a specific person. The article qualifies for statutory protection.

*Whether the article is "devoid of any reasonable factual support and any arguable basis in law"*

Once a defendant has shown that the protections of the statute apply, the burden shifts to the plaintiff to show that the article is "devoid of any reasonable factual support and any arguable basis in law," and also that it caused actual injury to the plaintiff. 12 V.S.A. § 1041(e)(1).

Ms. Cegalis does not claim that the content was inaccurate; rather she objects to inferences that readers could draw, and claims that the writer should not have used court records. The facts of the case were collected from court documents, police reports, and an interview with a State's Attorney. Court records are always accessible to the public unless sealed pursuant to a court process or otherwise exempt from public access. See Rules for Public Access to Court Records 6(a) ("The public shall have access to all case records, in accordance with the provisions of this rule, except as provided in subsection (b) of this section."). The public policy reason

5

behind public access to court records is to assure transparency of the court process and accountability to the public of the system of justice. Ms. Cegalis has not shown that the article falsely portrays the content of the public documents.

Ms. Cegalis represented at the hearing that many of the details in the article were taken from documents that have been sealed by the trial court. However, there was no showing that VTDigger got access to any such documents in violation of any court order limiting public access. Moreover, such an order generally bars a member of the public from getting access to such a document *from the court* when and if a record is not a publicly accessible court record. It does not prevent a journalist who already has access to the document from using it.

The article cannot be fairly read as advocating or assigning guilt to Ms. Cegalis for alleged sexual assaults. It clearly reports from court documents that the trial court found exactly the opposite with "finality." It also clearly indicates that the court found that the son's father and stepmother were waging a war against her. Moreover, reporting that a particular therapist believed the son's allegations is not the same as reporting or implying Ms. Cegalis's guilt.

Ms. Cegalis also objects on the ground that the article says or implies that the "case" is ongoing and consequently wrongly implies that the question of whether she in fact sexually abused her son, or permitted someone else to, remains up in the air. There is a section of the article under the heading "CASE REMAINS UNRESOLVED" from which one perhaps could draw that inference. The article does not compel that inference, however. As a whole the article makes clear that the trial court made a final determination that the sexual assault allegations are unsupported and that the matter will not be revisited. It also is clear that, at least at the time of the article's publication, the son's father nevertheless continued to believe the allegations anyway. The custody dispute itself and related litigation, as distinct from a determination on the sexual conduct allegations, were unresolved at the time. The inference is that the child's relationship with each of his parents is unresolved. This does not demonstrate that the content of the article is devoid of any reasonable factual support.

Ms. Cegalis asserts that VTDigger has allowed some readers to post comments underneath the article online that are highly critical of her but removed at least three comments from readers that were positive toward her. She said at the hearing that the three readers have told her that they are available to testify, but she did not include affidavits from them with her opposition filing. VTDigger has a posting policy regarding comments. It is unknown why any such comments, whatever their content, were removed. Even if Ms. Cegalis were able to show that VTDigger exercised questionable judgment in applying the posting policy, it would not change the analysis here. Reader comments typically convey reactions and cannot reasonably be read as content attributable to the writer of the article below which they were posted, even if VTDigger curates those comments with greater interest or care than other websites.

It is entirely reasonable that Ms. Cegalis would be upset by the article. Its subject matter is a matter of public interest, however, and it is not devoid of any reasonable factual support. The motion to strike therefore must be granted. It is unnecessary to address whether the article caused Ms. Cegalis any actual injury.

6

ORDER

For the foregoing reasons, Defendants' motion to strike is granted and the case is dismissed.

Dated at Montpelier, Vermont this ____ day of May 2017.

_____
Mary Miles Teachout
Superior Judge