*Morse v. North American Hockey Academy, Inc.*, No. 456-5-15 Cncv (Mello, J., May 23, 2018).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Chittenden Unit** | **Docket No. 456-5-15 Cncv** |

**Jason B. Morse, Elaine G. Morse,**
**Edward S. Horton, Jr., Helen K. Koselka,**
**and Elena N. Horton,**
        **Plaintiffs**

        **v.**

**North American Hockey Academy, Inc.,   Defendant**

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this civil action, Plaintiffs seek to recover from Defendant North American Hockey Academy, Inc. ("NAHA") the tuition they paid for their daughters to attend the its hockey school. Plaintiffs also seek an award of compensatory and punitive damages from NAHA on theories of breach of contract and the implied covenant of good faith and fair dealing, intentional misrepresentations and fraudulent inducement, unjust enrichment, quantum meruit, appropriation of name, invasion of privacy, defamation, and violation of the Consumer Protection Act.

Presently before the court is NAHA's motion for summary judgment on all of Plaintiffs' claims. Plaintiffs oppose the motion. Plaintiffs are represented by Christopher A. Micciche, Esq. Defendant is represented by William A. O'Rourke, III, Esq.

The Undisputed Facts

The following facts are undisputed, unless stated otherwise.

Plaintiffs Jason B. and Elaine G. Morse and their daughter Rachel M. Morse reside in Essex, Vermont. Plaintiffs Edward S. Horton, Jr. and Helen K. Koselka reside in Cincinnati, Ohio, and their daughter, Plaintiff Elena N. Horton, is a student at Dartmouth College in Hanover, New Hampshire.

NAHA, is a Vermont corporation which operates a commercial for-profit all-girls ice hockey academy in Stowe, Vermont. The academy offers to girls, who are in grades 8-12 and post-graduates, educational services, a competitive hockey training program, and the opportunity to play in state, regional and national tournaments where they can be seen, recruited and offered scholarships by college hockey coaches. These programs typically run for 24 weeks from September to March of the following year. Girls attending the program reside at the academy for the entire 24-week session. The stated goals of NAHA's hockey program are to prepare student-

athletes to play hockey at the highest possible level and to help them find the right college or university academically and athletically.

On January 28, 2013, Rachel M. Morse's parents enrolled her as a student-athlete at the NAHA academy for the 2013-2014 season. She and her parents signed an "Enrollment Agreement," which provided that:

> [T]he obligation to pay annual tuition for the entire academic year is unconditional. Students are accepted for the entire academic year. The obligation to pay tuition and fees for the full academic year of the Academy program in unconditional and after August 15 no portion of tuition and fees paid or outstanding will be refunded or canceled in the event of absence, withdrawal, or dismissal from the school of the athlete for any reason….

> In addition to entering into this agreement, enrollment is contingent upon both the parent(s) and athlete reviewing and agreeing to be bound by all obligations in the NAHA Student Handbook, a copy of which will be provided by NAHA. The NAHA Student Handbook must be signed by both parent(s) and athlete, and returned to NAHA prior to the athlete's enrollment at the school.

(Defendant's Exhibit B, p. 1). In connection with her enrollment, Rachel's parents paid NAHA $26,715 in tuition for the 2013-2014 season.

On September 28, 2013, Elena N. Horton signed an identical "Enrollment Agreement" (Defendant's Exhibit A). In connection with her enrollment, Elena's parents paid NAHA $26,715 in tuition for the 2013-2014 season.

The "Academy Handbook and Resource Guide states under "Athletics" the following:

> Mission

> The mission of NAHA is to provide female players with opportunities to develop and excel as athletes while maximizing their individual potential to reach their goals of playing hockey at the college and elite national levels.

> Expectations

> In order to prepare athletes for their experience at the next level, we structure the many components of our athletic program to mirror the demands, experiences and expectations of high level college programs. For many, this will be a significant change from their past experiences at the grassroots level of their sport. We expect that our athletes will immerse themselves in all facets of our program with a positive attitude, maximum individual effort and complete individual commitment as well as being committed to our team-first philosophy. Our graduates and their

college coaches' specifically cite this area as one of the most important lessons learned at NAHA to help prepared them to play at the next level.

Everyone starts with a clean slate when each season begins. Players can earn their game ice time through fulfillment of the expectations above. Every player accepted into the Academy is capable of playing at the level of our competition and within the level of her team. When performance falls below expectations, a player's playing time in games will be reduced.

(Defendant's Exhibit C, p. 9).

Although they were enrolled at the academy, Rachel M. Morse and Elena N. Horton did not compete in the 2013-2014 winter hockey session at NAHA.

Summary Judgment Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See H&E Equip. Servs., Inc. v. Cassani Elec., Inc., 2017 VT 17, ¶ 10; V.R.C.P. 56(a). The non-moving party is entitled to "the benefit of all reasonable doubts and inferences." Campbell v. Stafford, 2011 VT 11, ¶ 10, 189 Vt. 567 (mem.) (quotation omitted). In addition, "[s]ummary judgment is not a substitute for a determination on the merits, so long as evidence has been presented which creates an issue of material fact, no matter what view the court may take of the relative weigh of that evidence." Fritzeen v. Trudell Consulting Engineers, Inc., 170 Vt 632, 633 (2000) (mem.).

*Morse Plaintiffs' Breach of Contract and Implied Covenant of Good Faith and Fair Dealing Claim (Count 1 of Plaintiffs' Complaint)*

In Count 1 of the Complaint, the Morse Plaintiffs allege that, despite their daughter Rachel's efforts to excel and meet the expectations required of a student-athlete at NAHA, her coach, Jesse Driscoll, breached NAHA's contract with them, and breached the implied covenant of good faith and fair dealing, by, among other things: promising to make Rachel captain of the "red team" and then reneging on the promise "[w]ith no explanation or even an apology;" demoting Rachel from the team's "first and second lines where the better players … are assigned" to the third and then fourth lines "with the weakest players on the team;" steadily diminishing Rachel's ice time with no explanation given for doing so; repeatedly ignoring Rachel and passed her over during games to the point where she "saw little to no ice time;" dismissing Rachel's repeated inquiries about "how she could improve" by saying "I don't want to talk about it now;" repeatedly declining to discuss Rachel's concerns with her parents; deliberately "sabotag[ing]" her effort to "show well" at a tournament attended by the hockey coach from Brown University, who had come "to scout" her; and, when confronted by Rachel and her parents over his treatment of Rachel at that tournament, "rudely and disrespectfully" "storming out of the room" saying, "[i]f you're going to bother me every few weeks about this … [g]o play hockey for someone else" (Plaintiffs' Supplementary Opposition to Defendant's Motion for Summary Judgment, pp. 6-12; see, also Plaintiffs' interrogatory answers (Defendant's Exhibit D) ¶¶ 22, 23 and 30 ).

3

In its motion for summary judgment, NAHA contends that the Morse Plaintiffs lack essential evidence to support this claim. More specifically, NAHA contends that it cannot be held to have breached its contract by curtailing Rachel's ice hockey playing time because the agreement that the parties signed expressly gave NAHA's staff discretion to reduce any player's ice time. NAHA also points out that the agreement the parties signed contains a no-refund policy, so Plaintiffs cannot seek to recovery back the tuition and fees they paid for the 2013-2014 season.

The relationship between a student and her school is "contractual" in nature, and "'[t]he terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications of the institution.'" Reynolds v. Sterling College, Inc., 170 Vt. 620, 621 (2000) (mem.) (quoting Merrow v. Goldberg, 672 F. Supp. 766, 774 (D. Vt. 1987)). To be enforceable, however, those terms must be "specific and concrete." Reynolds, 170 Vt. at 621. Language in official school statements that is "merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable." Knelman v. Middlebury College, 898 F.Supp.2d 697, 709 (D. Vt. 2012) (citations omitted).

By accepting the Morses' "Enrollment Agreement" and their $26,715 tuition payment, NAHA entered into a contract with the Morses, under which their daughter Rachel was entitled to receive NAHA's educational and hockey training services, and to participate in its schedule of tournaments, for the full 2013-2014 academic year and hockey season. So long as Rachel complied with NAHA's rules and regulations, including its "expectations" that she "immerse [herself] in all facets of [its] program with a positive attitude, maximum individual effort and complete individual commitment as well as being committed to [its] team-first philosophy" ("Academic Handbook and Resource Guide, p. 9), NAHA could not deny her the full benefits of its programs without breaching its contract with the Morses.

One of Rachel's rights under the contract was to "earn [her] game ice time through fulfillment of the expectations above" (Id.). This provision of NAHA's Academic Handbook and Resource Guide is specific, concrete, and therefore enforceable.[1]

The fact that the contract gave NAHA's staff the discretion to "reduce" a student-athlete's "playing time in games," if his or her "performance falls below expectations," does not necessarily immunize NAHA from liability for curtailing an athlete's playing time. A contract is enforceable even when one party has discretion to make unilateral decisions. Century Partners v. Lesser Goldsmith Enterprises, 2008 VT 40, ¶ 26, 184 Vt. 215 ("The trial court correctly held that landlord's ability to withhold consent was 'subject to the implied covenant of good faith and fair dealing, present in every contract.'"); see also Carmichael v. Adirondack Bottled Gas Corp. of Vermont, 161 Vt. 200, 208 (1993) (quoting deTreville v. Outboard Marine Corp., 439 F.2d 1099, 1100 (4th Cir. 1971) ("[R]egardless of broad unilateral termination powers, the party who

_____

[1] Plaintiffs claim that a variety of promotional and other statements made by NAHA on its website and elsewhere, as well as statements by its hockey coach and head coach, also constitute enforceable contractual undertakings. NAHA denies that these statements are sufficiently specific and concrete to be enforceable. The court does not need to resolve these matters at this time. Because the court has determined that NAHA's Handbook provides the Plaintiffs with an enforceable contract claim, the court will defer consideration of these other issues to the time of trial.

terminates a contract commits an actionable wrong if the manner of termination is contrary to equity and good conscience."). In other words, language in a contract that gives a school broad discretion in the administration of its student programs does not give the school a license to act in a manner that is fundamentally unfair, arbitrary or capricious. Knelman, 898 F.Supp.2d at 710 (citations omitted). Therefore, NAHA can be liable for breach of contract if it reduced Rachel's playing time or otherwise denied her the benefits of its programs in bad faith.

Under Vermont law, a "covenant of good faith and fair dealing is implied in every contract." Century Partners, LP., 2008 VT at ¶ 21 (citing Carmichael). It is "an implied-in-law promise not to do anything to undermine or destroy [the plaintiff's] rights to receive the benefit of the parties' … agreement." R&G Props., Inc. v. Column Financial, Inc., 2008 VT 113, ¶ 46, 184 Vt. 494 (quotations omitted). The covenant "ensures that parties act with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Century Partners, 2008 VT at ¶ 21. However, the covenant of good faith and fair dealing "'does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract].'" Eastern Shore Markets, Inc. v. J.D. Assoc. Ltd. P'ship, 213 F.3d 175, 182 (4th Cir. 2000) (citation omitted) (cited with approval in Downtown Barre Development v. C&S Wholesale, 2004 VT 47, ¶ 18, 177 Vt. 70). Although '[g]ood faith is ordinarily a question of fact," plaintiffs are required to "provide a basis on which the fact finder can find a violation." R&G Props., 2008 VT at ¶ 46.

The Morses have come forward with sufficient evidence of bad faith to survive NAHA's motion for summary judgment. If, as the Morses have said, NAHA's hockey coach demoted Rachel from first line to fourth and reduced her ice time to little or none without providing her an explanation, refused her requests for feedback on how she could do better, deliberately sabotaged her opportunity to show a college recruiting coach what she could do on the ice at a game, and, when confronted by her parents, rudely told her to stop bothering him and go play for someone else, a jury could be justified in finding that NAHA had acted in bad faith.

The Morses have also come forward with sworn statements that they suffered economic and emotional damages as a result of NAHA's alleged breaches. They assert, for example, that they "were forced to incur over $45,000 in tuition and fees so Rachel could repeat her junior year at Phillips Exeter Academy and thereby attempt to salvage her college recruitment opportunities" (Plaintiffs' Interrogatory Answers (Defendant's Exhibit D), ¶ 42). They further state that "Rachel played for the varsity girl's hockey team at Phillips Exeter Academy during the 2014-2015 school year" (Id., ¶ 43). In addition, Rachel claims that she suffered emotional distress as a result of her coach's conduct. Although emotional distress damages are not typically available in a breach of contract action, such damages are available if the breach amounts to a tort. In Vermont, it is a tort to breach the covenant of good faith and fair dealing. Monahan v. GMAC Mortg. Corp., 2005 VT 110, ¶ 54 n. 5, 179 Vt. 167 ("Tort cases brought under Carmichael and its progeny involve breaches of implied contractual duties of good faith and fair dealing; breaches of express contractual terms sound in contract."). Therefore, emotional distress damages may be recoverable if the Morses prevail at trial on this claim.

For the foregoing reasons, NAHA's motion for summary judgment in its favor on Count 1 of the Complaint must be denied.

*Morse Plaintiffs' Intentional Misrepresentation/Fraudulent Inducement Claim*
*(Count 2 of Plaintiffs' Complaint)*

In Count 2 of their Complaint, the Morse Plaintiffs allege that NAHA fraudulently induced them into sending their daughter to NAHA's academy and paying NAHA nearly $30,000 in tuition and fees for the 2013-2014 season, by making representations that NAHA knew to be false. More specifically, the Morse Plaintiffs claim that NAHA's hockey coach, Jesse Driscoll, misrepresented to them that NAHA would "afford [their daughter] Rachel equal ice time by always 'rolling the lines' during games" (Plaintiffs' Supplementary Opposition to Defendant's Motion for Summary Judgment, pp. 12-14).

In its motion for summary judgment, NAHA contends that Plaintiffs lack essential evidence to support this claim. NAHA specifically contends that there is no evidence of any specific intentional misrepresentations of existing fact on which the Morse Plaintiffs actually relied in enrolling the daughter in the 2013-2014 season. In addition, NAHA contends that the Plaintiffs could not have reasonably relied upon the statements they claim Jesse Driscoll made to them about equal ice time for all players because such statements would have been contradicted by the agreement that Plaintiffs signed when they enrolled their daughter in the program. The court agrees.

"To maintain a cause of action for fraud, plaintiff must demonstrate five elements: '(1) intentional misrepresentation of a material fact; (2) that was known to be false when made; (3) that was not open to the defrauded party's knowledge; (4) that the defrauded party act[ed] in reliance on that fact; and (5) is thereby harmed.'" Felis v Downs Rachlin Martin, PLLC, 2015 VT 129, ¶ 13, 200 Vt. 465 (citation omitted). To be actionable, the misrepresentation must be "of existing fact, affecting the essence of the transaction…." Silva v. Stevens, 156 Vt. 94, 102 (1991). "Failure to prove any one of the five elements defeats the fraud claim." Felis ¶ 12. Moreover, "[t]he party alleging fraud has the burden of proving each of the elements by clear and convincing evidence." Estate of Alden v. Dee, 2011 VT 64, ¶ 32, 190 Vt. 401.

The Morse Plaintiffs' fraud claim fails for at least two reasons. First, Jesse Driscoll's alleged statement, that NAHA would "afford [their daughter] Rachel equal ice time by always 'rolling the lines' during games," does not appear to be a representation "of existing fact." At most, the statement appears to be the expression of an opinion as to how much ice time Rachel would likely get in the future, based upon NAHA's practice of "rolling the lines" during games.

Secondly, and more importantly, having signed NAHA's "Enrollment Agreement" and signed its "Academy Handbook and Resource Guide," the Morses could not have reasonably relied on Driscoll's statement that Rachel would always get equal ice time if she returned to the school for the 2013-2014 season. The Handbook clearly stated that student athletes were expected to "immerse themselves in all facets of [NAHA's] program with a positive attitude, maximum individual effort and complete individual commitment as well as being committed to our team-first philosophy" (Defendant's Exhibit C, p. 9). The Handbook went on to state that "[p]layers can earn their game ice time through fulfillment of the expectations above," and "[w]hen performance falls below expectations, a player's playing time in games will be reduced"

6

(Id.). In light of these clear provisions, the Morses could not have reasonably concluded from Driscoll's statements that Rachel would always receive equal ice time if she returned to NAHA for another season.

Because the Morses cannot sustain their burden of proving all five of the essential elements of their fraud claim by clear and convincing evidence, NAHA is entitled to summary judgment in its favor on Count 2 of the Complaint.

*Horton/Koselka Plaintiffs' Breach of Contract and Implied Covenant of Good Faith and Fair Dealing Claim (Count 3 of Plaintiffs' Complaint)*

In Count 3 of the Complaint, the Horton/Koselka Plaintiffs allege that, despite their daughter Elena's efforts to excel and meet the expectations required of a student-athlete at NAHA, her coaches breached NAHA's contract with them, and breached the implied covenant of good faith and fair dealing, by, among other things: retaliating against Elena for having arrived at school late that year, after having assured her parents that it would be alright if she arrived late; shunning Elena; failing to assign her to a consistent line of teammates for practices and competitions; significantly curtailing her playing time in competitions with no explanation given; and ignoring her parents' attempts to discuss Elena's concerns (Plaintiffs' Supplementary Opposition to Defendant's Motion for Summary Judgment, pp. 14-17); see, also Plaintiffs' Interrogatory Answers (Defendant's Exhibit E, ¶¶ 11, 27, 33, 34, and 38).

In its motion for summary judgment, NAHA makes the same arguments here as it made with respect to the Morses' breach of contract and covenant claim in Count 1 of the Complaint. Not surprisingly, the court's analysis is also the same here as in Count 1.

By accepting the Horton/Koselkas' "Enrollment Agreement" and their $26,715 tuition payment, NAHA entered into a contract with them, under which their daughter Elena was entitled to receive NAHA's educational and hockey training services, and to participate in its schedule of tournaments, for the full 2013-2014 academic year and hockey season, notwithstanding Elena's late arrival at school that year. So long as Elena complied with NAHA's rules and regulations, including its "expectations" of its student-athletes, NAHA could not deny Elena the full benefits of its programs without breaching its contract with her and her parents. One of Elena's rights under the contract was to "earn [her] game ice time through fulfillment of the expectations above." Although the contract gave NAHA's coaches the discretion to "reduce" a student-athlete's "playing time in games" if her "performance [fell] below expectations," NAHA can still be liable for breach of contract if it reduced Elena's playing time or otherwise denied her the benefits of its programs in bad faith. Because Plaintiffs have come forward with evidence of bad faith, NAHA's motion for summary judgment in its favor on Count 3 of the Complaint must be denied.

*Horton/Koselka Plaintiffs' Intentional Misrepresentations/Fraudulent Inducement Claim (Count 4 of Plaintiffs' Complaint)*

In Count 4 of the Complaint, the Horton/Koselka Plaintiffs allege that NAHA fraudulently induced them into sending their daughter to NAHA's academy and paying NAHA

nearly $30,000 in tuition and fees for the 2013-2014 season, by making misrepresentations that NAHA knew to be false. More specifically, the Horton/Koselka Plaintiffs claim that NAHA's hockey coach, Jesse Driscoll, misrepresented to them that "NAHA was very flexible," "there would be no problems at all if … Elena were to defer her arrival at NAHA" until the first week of November, and "even if they deferred Elena's arrival at NAHA, Rachel would nevertheless be afforded with all the benefits NAHA had afforded her the prior year" (Plaintiffs' Supplementary Opposition to Defendant's Motion for Summary Judgment, pp. 17-18, 21-22).

In its motion for summary judgment, NAHA contends that Plaintiffs lack essential evidence to support this claim. NAHA specifically contends that, even if Driscoll made the claimed statement, Plaintiff's fraud claim fails because it would be pure speculation to conclude that any diminution of ice playing time for Elena was caused by a misrepresentation that Plaintiffs relied on, as opposed to decisions made by the coaching staff within their discretion during the course of the season. The court disagrees.

The Horton/Koselka Plaintiffs have come forward with evidence supporting each of the five essential elements of their fraud claim. The alleged statements, that "NAHA was very flexible" and "there would be no problems at all if … Elena were to defer her arrival at NAHA," were a misrepresentation of existing fact affecting the essence of the transaction. The truth was that Driscoll's father, the head coach, was so "pissed" over Elena's failure to arrive at the start of the season that he instructed his coaching staff to cut her ice time. If Plaintiff's evidence is believed, then Jesse Driscoll either lied to the Horton/Koselkas about his father's views on the matter, or he failed to tell them that he had not consulted with his father before making the misrepresentations. Either way, Plaintiffs have made out a case of fraud. See Estate of Alden, 2011 VT 64, ¶ 32 ("Fraudulent misrepresentation can be accomplished affirmatively by false statement or by the concealment of facts by one who has a duty to disclose those facts."). Moreover, the misrepresentation and omission were material to the Horton/Koselka's decision to send their daughter back to NAHA, even though other commitments prevented her from getting there in time for the start of the season. In addition, there was no way for them to know that the statement was false, and they relied on the statement to their detriment.

Because the Horton/Koselka Plaintiffs have sufficient evidence to meet their burden on each of the elements of their fraud claim, NAHA's motion for summary judgment on Count 4 must be denied.

*Plaintiffs' Unjust Enrichment Claim (Count 5 of Plaintiffs' Complaint)*

In Count 5 of their Complaint, Plaintiffs allege that "Defendant accepted the benefits conferred upon it by Plaintiffs and it would be inequitable for Defendant not to compensate Plaintiffs for the value thereof" (Id., ¶ 57). The only "benefits" Plaintiffs claim to have "conferred" upon NAHA are the tuition and fees they paid for their daughters to attend NAHA's 2013-2014 academy season (Defendant's Exhibits D, ¶ 64 and E, ¶ 54).

"A claim for unjust enrichment requires that (1) a benefit was conferred on defendant; (2) defendant accepted that benefit; and (3) it would be inequitable for defendant not to compensate [plaintiff] for its value." Unified CCR Partners v. Zimmer, 2016 VT 33, ¶ 21, 201 Vt. 474 ((citation omitted); see also Kellogg v. Shushereba, 2013 VT 76, ¶ 22, 194 Vt. 446

8

(explaining that unjust enrichment applies if under the totality of circumstances it would be inequitable for the benefited party to retain benefit).

NAHA contends that it is entitled to summary judgment on this claim because the doctrine of unjust enrichment does not apply under the facts and circumstances of this case. Plaintiffs argue that the doctrine does apply because it "would be inequitable for NAHA to retain [their tuition and fee payments] in light of the services NAHA failed to provide as specific in the Enrollment Agreement entered into between NAHA and [the Plaintiffs]" (Plaintiffs' Supplemental Opposition to Defendant's Motion for Summary Judgment, pp. 18-19).

The court agrees with NAHA on this issue. The doctrine of unjust enrichment clearly does not apply to the payments that NAHA received from the Plaintiffs. Those payments were made and received in the context of a bargained-for exchange under which the parties received benefits from, and conferred benefits upon each other. Plaintiffs paid the tuition and fees pursuant to an agreement they had signed when they enrolled their daughters in NAHA's academy for the 2013-2014 season. In return, NAHA provided Plaintiffs' daughters with room and board, educational services, hockey training, and the opportunity to play in tournaments. If NAHA failed to provide the quality or level of services that Plaintiffs expected to receive, they might have a cause of action for breach of contract, but they do not have a claim for unjust enrichment.

Moreover, the agreements that Plaintiffs signed expressly state that "no portion of tuition or fees paid … will be refunded … in the event of absence, withdrawal, or dismissal from the school of the athlete for any reason…." (Defendant's Exhibit B, p. 1). Under the totality of the circumstances, equity does not demand that NAHA return the tuition and fees that it received from the Plaintiffs. NASA is entitled to summary judgment in its favor on Count 5 of the Complaint.

*Plaintiffs' Quantum Meruit Claim (Count 6 of Plaintiffs' Complaint)*

In Count 6 of their Complaint, Plaintiffs allege that "Plaintiffs are entitled to recover from Defendant the fair and reasonable value of the benefits conferred upon it by Plaintiffs for which Defendant has refused or neglected to compensate Plaintiffs" (Id. ¶ 59). Again, the only "benefits" Plaintiffs claim to have "conferred" upon NAHA are the tuition and fees they paid for their daughters to attend NAHA's 2013-2014 academy season (Defendant's Exhibits D, ¶ 65 and E, ¶ 55).

Unjust enrichment and quantum meruit are not distinct causes of action. The Vermont Supreme Court has explained that "the distinction between the two lies not in the alleged wrong committed by the defendant but rather in the measure of recovery for that wrong." D.J. Painting, Inc. v. Baraw Enters., Inc., 172 Vt. 239, 242 n. 2 (2001) (citing In re Estate of Elliott, 149 Vt. 248, 253 (1988) ("Unjust enrichment focuses on the value of the benefit actually conferred upon the defendant. Quantum meruit, on the other hand, is determined by the reasonable value of plaintiff's services regardless of their value to the defendant.")).

Because this cause of action is indistinguishable from Plaintiffs' unjust enrichment claim, the same reasoning applies to it. Therefore, NAHA is entitled to summary judgment in its favor on this claim, as well.

*Plaintiff Elena N. Horton's Appropriation of Name Claim (Count 7 of Plaintiffs' Complaint)*

In Count 7 of the Complaint, Plaintiff Elena N. Horton alleges: "Without any express or implied authority to do so, NAHA has caused to be published Plaintiff, Elena N. Horton's name as a graduate of NAHA's class of 2014 and Dartmouth College admittee for the sole purpose of advertising NAHA and thereby enhancing its own reputation and advancing its own economic interests" (Id. ¶ 61). Elena contends that "[t]his constitutes an unlawful appropriation of [her] name" and that NAHA's actions "caused [her] to suffer damages…." (Id. ¶¶ 61-62).

In it motion for summary judgment, NAHA contends that summary judgment must be granted in its favor because Elena N. Horton cannot show that she was harmed by the alleged conduct. The court disagrees.

In the Restatement (Second) of Torts (1977), four separate invasion of privacy torts are recognized: intrusion upon seclusion, § 652B; appropriation of another's name or likeness, § 652C; unreasonable publicity given to another's private life, § 652D; and publicity that unreasonably places another in a false light before the public, § 652E. The claim asserted in Count 7 squarely falls within the second category of recognized privacy torts.

The Vermont Supreme Court has expressly recognized a cause of action for the appropriation of another's name or likeness for commercial purposes. In <u>Staruski . Continental Telephone Co.</u>, 154 Vt. 568, 572-73 (1990), the Court stated, "we now hold that a damage remedy for invasion of privacy by the appropriation of a person's identity, at least when done for commercial purposes, should be available in appropriate circumstances in Vermont as in other States." The essential elements of this cause of action are: (1) the appropriation by defendant of plaintiff's name or likeness; (2) without plaintiff's consent; (3) for defendant's own benefit or business advantage; (4) done in a way that benefitted the defendant; and (5) harmed the plaintiff. <u>Id.</u>, 154 Vt. at 571-79.

The "incidental use" of a person's name is not enough to impose liability. "It is only when [the defendant] makes use of the name to pirate the plaintiff's identity for some advantage of his own … that he becomes liable." <u>Id.</u> at 571 (citations and quotations omitted). Although the plaintiff must "prove a benefit to the defendant, … a dollar amount need not be established." <u>Id.</u> at 574. Similarly, proof that the plaintiff suffered some amount of mental distress due to the appropriation of her identity is all that is needed to show that she was harmed. <u>Id.</u> Lastly, it does not matter that the plaintiff is not a famous person. <u>Id.</u> at 573.

Here, Elena testified at her deposition that, following her withdrawal from NAHA and her admission to Dartmouth College, NAHA published an announcement on its website listing her as a "grad" of NAHA's class of 2014 who had been admitted to the hockey program at Dartmouth College (Deposition of Elena N. Horton, pp. 92-95). Elena also testified that she was

10

offended by the announcement because it was untrue (she had not in fact graduated from NAHA), she had not consented to having her name so listed on NAHA's website, and NAHA's announcement implied that her success in getting admitted to Dartmouth was due to the education and training that she had received while at NAHA, when, from her perspective, NAHA had mistreated her and she had gotten into Dartmouth despite, not because of her experience at NAHA (Id.).

Based upon such testimony, a jury could conclude that NAHA invaded Elena's privacy by appropriating her identity to promote its business advantage at her expense. Therefore, NAHA's motion for summary judgment on Count 7 of the Complaint must be denied.

*Plaintiff Elena N. Horton's Invasion of Privacy Claim (Count 8 of Plaintiffs' Complaint)*

In Count 8 of the Complaint, Plaintiff Elena N. Horton again alleges that: "Without any express or implied legal authority to do so, NAHA has caused to be published Plaintiff, Elena N. Horton's name as a graduate of NAHA's class of 2014 and Dartmouth College admittee for the sole purpose of advertising NAHA and thereby enhancing its own reputation and advancing its own economic interests" (Id., ¶ 64). Elena contends that "[t]his constitutes an unlawful invasion of [her] privacy" and that NAHA's actions "caused [her] to suffer damages…." (Id., ¶¶ 65-66).

In this count, Elena alleges and relies upon the same facts as she asserted in Count 7, above. The only difference is Elena's contention that those facts support not only a claim for wrongfully appropriating her name, but also a claim for wrongfully invading her privacy. However, the conduct that Elena complains of does not meet the criteria of any recognized cause of action for invasion of privacy, other than the one asserted in Count 7. See Hodgdon v. Mt. Mansfield Co., 160 Vt. 150, 162 (1992) ("To state a cause of action for intrusion upon seclusion, the plaintiff must allege 'an intentional interference with [her] interest in solitude or seclusion, either as to [her] person or as to [her] private affairs or concerns, of a kind that would be highly offensive to a reasonable [person]….' Moreover, the intrusion must be substantial."); and Lemnah v. American Breeders Service, Inc., 144 Vt. 568, 574 (1984) (considering two other forms of the tort – unreasonable publicity given to a person's private life and publicity that unreasonably places the person in a false light). Therefore, NAHA is entitled to summary judgment in its favor on Count 8 of the Complaint.

*Plaintiff Elena N. Horton's Defamation Claim (Count 9 of Plaintiffs' Complaint)*

In Count 9 of the Complaint, Plaintiff Elena N. Horton alleges: "Without any express or implied legal authority to do so, NAHA has caused to be published Plaintiff, Elena N. Horton's name as a graduate of NAHA's class of 2014" (Id., ¶ 68). Elena further alleges that, "[w]hereas at all times relevant hereto NAHA knew the aforesaid publication to be manifestly untrue, it constitutes defamation per se" (Id. ¶ 69). Elena claims that NAHA's actions "caused [her] to suffer damages…." (Id. ¶ 70).

In its motion for summary judgment, NAHA contends that Elena N. Horton cannot prevail on her defamation claim because she cannot prove that NAHA's statement was

defamatory or that she suffered any actual harm. Elena contends that NAHA's statement was defamatory per se and, therefore, that she does not need to prove actual harm in order to recover.

The elements of a defamation claim are: "(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se, and (6) some actual harm so as to warrant compensatory damages." Russin v. Wesson, 2008 VT 22, ¶ 5, 183 Vt. 301 (quoting Lent v. Huntoon. 143 Vt. 539, 546-47 (1983). "A defamatory statement is one that tends to 'blacken the reputation of the plaintiff and expose her to public hatred, contempt or ridicule.'" Davis v. Am. Legion, 2014 VT 134, ¶ 22, 198 Vt. 204 (citation omitted) (holding statements, that plaintiff failed to leave a club's karakoke night with a minor after the 7:00 p.m deadline, did not follow the directions of staff, verbally attacked officers, and made inaccurate comments on social media, not severe enough to be defamatory). Vermont recognizes four categories of defamation per se: "(1) imputation of a crime; (2) statements injurious to one's trade, business or occupation[;] (3) charges of having a loathsome disease… [;] or (4) charging a woman to be unchaste."Knelman v. Middlebury College, 898 F.Supp.2d 697, 726 (D. Vt. 2012) (quoting Lent v. Huntoon).

While NAHA's statement, that Elena was a "grad" of its 2014 session, may have been untrue, that is not enough to make it actionable as defamation. To be actionable the statement must be "false and defamatory." Russin, 2008 VT 22, ¶ 5 (emphasis added). Calling someone a graduate of NAHA's hockey academy does not and could not blacken their reputation, or expose them to public hatred, contempt or ridicule, or diminish their hope of becoming a hockey star. Because NAHA's statement was not defamatory as a matter of law, NAHA is entitled to summary judgment in its favor on Count 9 of the Complaint.

*Plaintiffs' Consumer Protection Act Claim (Count 10 of Plaintiffs' Complaint)*

In Count 10 of the Complaint, Plaintiffs allege that NAHA violated Vermont's Consumer Protection Act ("CPA") by making misrepresentations to the Plaintiffs in order to induce them to send their daughters to NAHA and pay NAHA nearly $30,000 per child in tuition and fees for the 2013-2014 academy season (Complaint ¶¶ 71-76). More specifically, the Morse Plaintiffs claim that NAHA's hockey coach, Jesse Driscoll, misrepresented to them that NAHA would "'always roll the lines' and … giv[e] their daughter, Rachel equal playing time" (Plaintiffs' Supplementary Opposition to Defendant's Motion for Summary Judgment, pp. 21-22). The Horton/Koselka Plaintiffs claim that NAHA misrepresented that "NAHA was very flexible and there would be no problems at all if their daughter, Elena were to defer her arrival at NAHA" (Id.).

In its motion for summary judgment, NAHA contends that Plaintiffs lack essential evidence to support this claim. NAHA specifically contends that Plaintiffs cannot pursue a CPA claim because they are not "consumers" as defined by the Act and because they also assert a breach of contract claim in their Complaint, and the Act "does not reach conduct that is a breach of an existing contract" (Defendant's Motion for Summary Judgment, p. 11).

Vermont's Consumer Protection Act ("CPA") declares that "unfair or deceptive acts or practices in commerce" are unlawful. 9 V.S.A. § 2453(a). A consumer who contracts for products or services in reliance upon, or who sustains injury as a result of fraudulent representations prohibited by § 2453 may bring an action to "recover from the seller … the amount of his or her damages, or the consideration … given by the consumer, reasonable attorney's fees, and exemplary damages not exceeding three times the value of the consideration given by the consumer." Id. § 2461(b).

The Vermont Supreme Court has adopted the following test as to what constitutes a deceptive act: "(1) there must be a representation or omission likely to mislead the consumer; (2) the consumer must be interpreting the representation or omission reasonably under the circumstances; and (3) the misleading effects of the representation or omission must be 'material,' that is likely to affect the consumer's conduct or decision with respect to the product or service offered." Terry v. O'Brien, 2015 VT 132, ¶ 28, 200 Vt. 511 (citation omitted). "[I]ntent to deceive or bad faith is not required for there to be liability under the CPA." Id. (citation omitted).

Each of the parents who are Plaintiffs in this case is a "consumer" under the CPA because each "contract[ed] for, or otherwise agree[d] to pay consideration for … services … for .. the use or benefit of a member of his or her household" (i.e, his or her daughters). 9 V.S.A. § 2451a(a). The daughters are also "consumers" under the Act because they were the ones for whom NAHA's services were contracted for and who actually used those services. See Elkins v. Microsoft Corp., 174 Vt. 328, 331 (2002) (construing the term "consumer" liberally in light of the CPA's "remedial … nature" and its goals "to 'protect the public' against 'unfair or deceptive acts or practices' and to 'encourage fair and honest competition.'"). NAHA's argument to the contrary is without merit.

In addition, NAHA was clearly a "seller" of "services" under the CPA. The Act defines a "seller" as "a person regularly and principally engaged in a business of selling … services to consumers," Id. § 2451a(c), and "services" are defined to include "any … courses of instruction or training," Id. § 2451a(b). Therefore, NAHA can be liable under the Act if it made material misrepresentations that mislead the Plaintiffs into agreeing to send their daughters to NAHA and pay the required tuition and fees for the 2013-2014 season.

As noted above, the Morse Plaintiffs claim that Jesse Driscoll, NAHA's hockey coach, assured them that, if they sent their daughter to his academy, NAHA would "always roll the lines' and … giv[e] their daughter, Rachel equal playing time." The Morse Plaintiffs claim that this was a misrepresentation because Driscoll did not honor the promise and never intended to be bound to do so. The court agrees with NAHA that this alleged promise cannot support a CPA claim. For purposes of the CPA, "[d]eception is measured by an objective standard, looking to whether the representation or omission had the 'capacity or tendency to deceive' a reasonable consumer…." Carter v. Gugliuzzi, 168 Vt. 48, 56 (1998).

No reasonable consumer who signed NAHA's "Enrollment Agreement" and read its "Academy Handbook and Resource Guide" would have been deceived by Driscoll's statement into believing that Rachel would always be given equal playing time on the ice, if she chose to

13

attend the school. The Handbook clearly stated that student athletes were expected to "immerse themselves in all facets of [NAHA's] program with a positive attitude, maximum individual effort and complete individual commitment as well as being committed to our team-first philosophy" (Defendant's Exhibit C, p. 9). The Handbook went on to state that "[p]layers can earn their game ice time through fulfillment of the expectations above," and "[w]hen performance falls below expectations, a player's playing time in games will be reduced" (Id.). The Morse Plaintiffs may have a claim for breach of contract if they can prove to a jury that NAHA failed to fulfil any of the contractual promises that were made to them, but a CPA violation cannot be premised solely upon a breach of contract. Winey v. William E. Dailey, Inc., 161 Vt. 129, 136 (1993) ("We have cautioned against confusing principles of contract with fraud so that the elements of fraud are made out by a mere breach of contract… Similarly, we are reluctant to conclude that the Legislature intended a mere breach of contract to raise a presumption of fraud.") (citation omitted).

The outcome with respect to the Horton/Koselka Plaintiffs, however, is quite different. As noted above, the Horton/Koselka Plaintiffs claim that Jesse Driscoll misrepresented to them that "NAHA was very flexible and there would be no problems at all if their daughter, Elena were to defer her arrival at NAHA" until the first week of November 2013. In reliance upon that assurance, the Horton's held off on sending Elena to NAHA that fall so that she could deal with a number of other issues. When Elena arrived at NAHA, however, the Horton/Koselkas claim that "NAHA … failed to assign [Elena] to a consistent line of teammates for practices and competitions," NAHA "significantly curtailed her playing time in competitions with no explanation given," and things went from bad to worse for Elena at NAHA thereafter (Plaintiffs' Supplementary Opposition to Defendant's Motion for Summary Judgment, pp. 14-17). Later, when the Hortons asked Assistant Coach Melissa Rundlett why Elena was "being neglected and mistreated," Rundlett replied that Head Coach William Driscoll (Jesse's father) was "pissed" at Elena for arriving at school late and had directed Melissa to only give Elena two shifts per game for the rest of the weekend" (Id., p. 18).

These facts, if believed, could support a finding that NAHA violated the CPA. Jesse Driscoll's assurance that NAHA would be "very flexible" and "there would be no problems at all" if Elena deferred her arrival until November, was false because his father, the head coach, was "pissed" that Elena arrived late. The representation was objectively deceptive because it had "the capacity or tendency" to deceive a reasonable consumer in position of the Horton/Koselkas into believing that no one at NAHA would have held it against Elena if she delayed her arrival until early November. The misrepresentation was also material because a reasonable person would regard such a statement as important in making a decision whether to send their daughter to NAHA that year, even though she could not get there at the beginning of the session; moreover, there would have been no way for the Horton/Koselkas to have independently discovered that Driscoll's representation was false. Carter v. Gugliuzzi, 168 Vt. at 56 ("Materiality is also generally measured by an objective standard, premised on what a reasonable person would regard as important in making a decision; it may include a subjective test, however, when the seller knows that the consumer, because of some peculiarity, is particularly susceptible to an omission or misrepresentation.").

For the foregoing reasons, NAHA is entitled to summary judgment in its favor on the Morse Plaintiffs' CPA claim, but its motion must be denied as to the Horton/Koselka Plaintiffs' claim.

## **ORDER**

For the foregoing reasons:

(1) Defendant's motion for summary judgment is hereby GRANTED with respect to the claims set forth in Counts 2, 5, 6, 8, and 9 of the Complaint, and with respect to the claim set forth by the Morse Plaintiffs in Count 10 of the Complaint; and

(2) Defendants' motion for summary judgment is DENIED with respect to the claims set forth in Counts 1, 3, 4 and 7 of Plaintiffs' Complaint and with respect to the claim set forth by the Horton/Koselka Plaintiffs in Count 10 of the Complaint; and

(3) The Clerk shall add this case to the September 2018 list of cases to be set for pre-trial conferences and jury draws.

SO ORDERED this 23rd day of May, 2018.

_____
Robert A. Mello, Superior Judge